# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MATTHEW SCIABACUCCHI and
HIALEAH EMPLOYEES' RETIREMENT
SYSTEM,

      Plaintiffs,

      v.

LIBERTY BROADBAND
CORPORATION, JOHN MALONE,
GREGORY MAFFEI, MICHAEL
HUSEBY, BALAN NAIR, ERIC
ZINTERHOFER, CRAIG JACOBSON,
THOMAS RUTLEDGE, DAVID
MERRITT, LANCE CONN, and JOHN
MARKLEY,

      Defendants,
 and

CHARTER COMMUNICATIONS, INC.,

      Nominal Defendant.

C.A. No. 11418-VCG

## <u>MEMORANDUM OPINION</u>

Date Submitted:  January 19, 2022
Date Decided:  May 2, 2022

Nathan A. Cook, of BLOCK & LEVITON LLP, Wilmington, Delaware; Kurt M.
Heyman, Aaron M. Nelson, and Melissa N. Donimirski, of HEYMAN ENERIO
GATTUSO & HIRZEL LLP, Wilmington, Delaware; OF COUNSEL: Jason M.
Leviton, Joel A. Fleming, and Lauren G. Milgroom, of BLOCK & LEVITON LLP,
Boston, Massachusetts, *Attorneys for Plaintiff Matthew Sciabacucchi.*

Gregory V. Varallo and Andrew E. Blumberg, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; OF COUNSEL: Alla Zayenchik and Thomas James, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York, *Attorneys for Plaintiff Hialeah Employees' Retirement System.*

David C. McBride, Martin S. Lessner, James M. Yoch, Jr., and Paul J. Loughman, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: William Savitt, Ryan A. McLeod, Anitha Reddy, Adam M. Gogolak, David E. Kirk, and Zachary M. David, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for Defendants Lance Conn, Michael Huseby, Craig Jacobson, John Markley, David Merritt, Balan Nair, Thomas Rutledge, and Eric Zinterhofer.*

Peter J. Walsh, Jr., Brian C. Ralston, Tyler J. Leavengood, and Jaclyn C. Levy, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Richard B. Harper, of BAKER BOTTS LLP, New York, New York; Thomas E. O'Brien, of BAKER BOTTS LLP, Dallas, Texas, *Attorneys for Defendants Liberty Broadband Corporation, John Malone, and Gregory Maffei.*

**GLASSCOCK, Vice Chancellor**

It has become a commonplace that motions for summary judgment are not sustainable in most internal-affairs corporate litigation in this Court. Even this Court's practice guide suggests as much.[1] It is not hard to see why. Nearly all allegations in such litigation have already withstood a motion to dismiss, often under the demanding standard of Rule 23.1. Then, discovery has ensued, which often creates enormous records such that a pursuit of summary judgment rivals a trial in the way of effort, for litigants and jurists alike. Most importantly, such litigation typically involves alleged fiduciary duty breaches. These issues involve agency questions, resolution of which involves a determination of parties' intentions and motivations, issues typically best resolved following live testimony.

The instant case involves approval by corporate directors of challenged transactions advocated by two directors who were dual fiduciaries, for both the pertinent company *and* for the counterparty to the transactions. I evaluated whether the stockholder-Plaintiff's[2] allegations were sufficient, at the pleading stage, to make it reasonably conceivable that the majority of the board of directors was unable to bring its business judgment to bear in a decision to sue fellow directors and the counterparty; I concluded that Plaintiff Sciabacucchi had succeeded, and that demand, accordingly, was excused. Relying on the same pleadings and the plaintiff-

---

[1] Guidelines to Help Lawyers Practice in the Court of Chancery, § C(5)(e)(iii)(C) (Aug. 2021).
[2] I use the singular, because this review occurred prior to the stipulated entry of a second plaintiff in this action. *See infra* note 9 and accompanying text.

friendly assumptions of Rule 12(b)(6), I found it reasonably conceivable that a majority of the board of directors was not independent of the dual fiduciaries, and therefore business judgment did not apply at the motion-to-dismiss phase of the proceedings. Vigorous discovery on the Plaintiffs' allegations ensued.

Before me now are two motions for summary judgment on grounds similar to those rejected under Rule 12(b)(6). These are by no means frivolous or make-weight motions. They are thoughtful attempts by the Defendants to achieve a litigation victory without the further effort and expense of trial. And achieving summary judgment in fiduciary duty matters, if unlikely, is by no means impossible. Although I have previously addressed these issues at the pleading stage, on summary judgment review, a record exists. The presumption is in favor of director independence, and the burden at trial will be for the Plaintiffs to submit evidence sufficient to rebut that presumption. It is in light of the seriousness of the Defendants' motions, and in light of those facts as have been advanced, that I undertake the following substantive review, which attentive readers[3] will no doubt find a slog. After that review, however, I find that the Defendants are not entitled to summary judgment here. The Defendants have pointed to the evidentiary record as implying that a majority of the board of directors is independent. They compare this to contrary inferences drawn by the Plaintiffs supporting a finding of lack of independence, which they find weak.

---

[3] If any.

If it were the movants' burden here merely to convince me that it is more likely than not that I will find the majority of the board of directors independent after trial, the result might, perhaps, be different. But my task here is not to weigh the evidence, or to weigh the comparative strength of competing inferences themselves adequately supported by the evidence. I conclude there is sufficient evidence of record that a majority of the board of directors lacked independence to go forward to trial. Of course, if I find after trial that a majority of the board of directors was unconflicted, the business judgment rule may apply to the challenged transactions. But I cannot find here that business judgment applies, as a matter of law.[4]

The Defendants also contend that the evidence demonstrates as a matter of law that the challenged transactions were entirely fair. Again, at this stage, I must decline to enter summary judgment, based on the record as it exists. Assuming that entire fairness applies, that matter is for a post-trial decision, as well.

## I. BACKGROUND

The transactions underlying the remaining causes of action here are, to put it mildly, intricate, and have been recounted in detail in my prior opinions in this

---

[4] The Plaintiffs advance other theories on which they may recover derivatively, even if the majority of the board is found independent. Given my decision here, I need not address these theories in this Memorandum Opinion—they are preserved for trial.

matter, *Sciabacucchi I*[5] and *Sciabacucchi II*.[6]  The interested reader should refer to those memorandum opinions for the fullest possible background.  The facts included in the following section are strictly those necessary to resolution of the motions before me.

*A. Factual Overview*[7]

1. The Parties and Relevant Non-Parties

Plaintiff Matthew Sciabacucchi has been the plaintiff in this action since its inception.[8]  Plaintiff Hialeah Employees' Retirement System (together with Sciabacucchi, the "Plaintiffs") joined the action via stipulation in November 2019.[9]

---

[5] *See Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *17 (Del. Ch. May 31, 2017) [hereinafter "*Sciabacucchi I*"].

[6] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *13 (Del. Ch. July 26, 2018) [hereinafter "*Sciabacucchi II*"].  I note that the operative complaint in *Sciabacucchi I* and *Sciabacucchi II* was the first amended complaint in this action.  The operative complaint here is the second amended complaint.  Verified Second Am. Derivative Compl., Dkt. No. 287 [hereinafter "Compl."]

[7] Where facts beyond my prior opinions are necessary, I draw them from the evidence submitted under affidavit with the parties' papers.  Citations in the form of "Cook Decl. —" refer to the Transmittal Decl. Pursuant to 10 *Del. C.* § 3927 of Nathan A. Cook Connection Pls.' Omnibus Answering Br. Opp'n Defs.' Mots. Summ. J., Dkt. No. 326.  Citations in the form of "Cook Decl., Ex. —" refer to the exhibits attached to the Cook Declaration, Dkt. Nos. 327–29.  Citations in the form of "Loughman Decl. —" refer to the Transmittal Aff. of Paul J. Loughman Supp. Director Defs.' Opening Br. Supp. Their Mot. Summ. J., Dkt. No. 306.  Citations in the form of "Loughman Decl., Ex. —" refer to the exhibits attached to the Loughman Declaration, Dkt. Nos. 307, 308, 310–18.

[8] Verified Class Action Compl. for Breach of Fiduciary Duties, Dkt. No. 1.

[9] Granted (Stipulation and Proposed Order Regarding Joinder of Hialeah Employees' Retirement System), Dkt. No. 136.

Both of the Plaintiffs were stockholders of Charter Communications, Inc. ("Charter" or the "Company") at the time of the challenged transactions.[10]

Nominal Defendant Charter is a Delaware corporation and is one of the largest cable providers in the United States.[11]  Charter's board of directors (the "Board") consisted of the following directors at the pertinent time: Defendants John Malone, Gregory Maffei, W. Lance Conn, John Markley, Jr., David Merritt, Craig Jacobson, Michael Huseby, Eric Zinterhofer, Balan Nair, and Thomas Rutledge (collectively, the "Director Defendants").[12]  Rutledge was Charter's Chief Executive Officer ("CEO"[13]); Zinterhofer was Charter's Chairman of the Board prior to the challenged transactions.[14]

Defendant Liberty Broadband Corporation ("Liberty Broadband") is a Delaware corporation, and a 26%[15] stockholder in Charter, making it the largest

---

[10] *See Sciabacucchi II*, 2018 WL 3599997, at *2; Aff. and Verification of Robert W. Williams III on Behalf of Hialeah Employees' Retirement System in Supp. of Mot. for Permissive Joinder of Hialeah Employees' Retirement System ¶ 2, Dkt. No. 130.

[11] *Sciabacucchi II*, 2018 WL 3599997, at *2.

[12] *Id.*  Note that for these motions—unlike the motion to dismiss—Malone and Maffei have moved with the other directors, rather than with Liberty Broadband.  *See* Director Defs.' Mot. Summ. J., Dkt. No. 306.

[13] I use this defined term, along with similarly abbreviated terms for chief financial officer and chief technology officer, without specificity as to any one person throughout this Memorandum Opinion.

[14] *Sciabacucchi I,* 2017 WL 2352152, at *5.

[15] The exact percentage ownership Liberty Broadband had in Charter at the time of the Acquisitions is not clear from the record, which references the original 27.3% investment in 2013, as well as 26% ownership and 27% ownership figures.  *See* Loughman Decl., Ex. 17, at Ex. 99.1 (press release affiliated with the original investment specifying that the percentage beneficial ownership obtained by Liberty Media was 27.3%); Compl. ¶ 169 (referring, via quotation, to "above 26%" ownership in Charter); *id.* ¶ 3 (referring to 27% ownership); *Sciabacucchi II*, 2018

5

Charter stockholder.[16]  Liberty Broadband once was a wholly owned subsidiary of non-party Liberty Media Corporation ("Liberty Media"), which spun off Liberty Broadband in 2014.[17]  Malone owns approximately 47% of the voting power of Liberty Broadband.[18]

Liberty Broadband has certain contractual rights with respect to Charter, including the right to designate four of ten Board members.[19]  The four Board members at the pertinent time were Malone, Maffei, Nair, and Huseby.[20]  This Memorandum Opinion refers to Malone, Maffei, Nair, and Huseby from time to time as the "Liberty Broadband designees."  Similarly, this Memorandum Opinion refers to Conn, Markley, Merritt, Jacobson, Zinterhofer, and Rutledge as the "non-Liberty Broadband directors" upon occasion.

Non-party Advance/Newhouse Partnership ("Newhouse") is a privately owned New York partnership.[21]  Prior to the transactions at issue in this matter, Newhouse owned non-party Bright House Networks, LLC ("Bright House"),

---

WL 3599997, at *2 (referring to "approximately 26%" ownership of Charter by Liberty Broadband).  I am confident the ultimate figure was close to 26%, and therefore use that figure throughout this Memorandum Opinion.

[16] *Sciabacucchi II*, 2018 WL 3599997, at *1–2.

[17] *Id.* at *1.

[18] *Id.*

[19] *Id.* at *2.

[20] *Id.*

[21] *Sciabacucchi I*, 2017 WL 2352152, at *6.

another cable company.[22] Non-party Steve Miron was the Newhouse CEO at the pertinent time.[23]

Other pertinent non-parties include Time Warner Cable Inc. ("TWC"), Liberty Global plc ("Liberty Global"); Liberty Latin America ("Liberty LatAm"); Mike Fries, the CEO of Liberty Global; and Searchlight Capital Partners, L.P. ("Searchlight"). Both Liberty Global and Liberty LatAm are, as their names suggest, part of the broader Malone-affiliated Liberty conglomerate.[24] Searchlight is a private equity firm that Zinterhofer co-founded.[25]

Because this Memorandum Opinion undertakes a deep dive into the independence of certain Charter directors, I also broadly outline here facts necessary to the independence inquiry. The parties do not dispute many, if any, facts pertaining to director independence; rather, the inquiry focuses on the *inferences to be drawn* from the undisputed facts. A subset of the most important facts pertaining to independence is organized below, with a full discussion proceeding in the pertinent analysis section.

---

[22] *Sciabacucchi II*, 2018 WL 3599997, at *3.

[23] Pls.' Omnibus Answering Br. Opp'n Defs.' Mots. Summ. J. 21, Dkt. No. 326 [hereinafter "AB"] (identifying Miron as CEO of Newhouse).

[24] *See, e.g.*, Cook Decl., Ex. 93, at GS_096216 (showing Liberty Global as part of the Liberty companies overview); *see also* Loughman Decl., Ex. 115 (describing Liberty Latin America as "one of the companies in the Malone Liberty orbit").

[25] *See* Loughman Decl., Ex. 59, 25:5–9.

### a. Zinterhofer

As noted above, Zinterhofer was the Chairman of Charter's Board at the time of the pertinent transactions, though he did not retain that title following the associated closings.[26] Newhouse insisted upon the change in Chairman from Zinterhofer to Rutledge, citing Newhouse's "confidence in Tom [Rutledge]."[27] The Plaintiffs push the alternative theory—supported by documentary evidence from Newhouse's financial advisors—that Newhouse may have had concerns regarding Zinterhofer's independence from the Liberty entities.[28] This theory is discussed in full detail in the pertinent analysis section.

The most important subset of facts relating to Zinterhofer's independence stems from Searchlight, the venture capital fund Zinterhofer co-founded in 2010.[29] Searchlight (of which Zinterhofer was "approximately" a 30% owner at the pertinent time) has engaged in multiple business dealings with Liberty Global, one of Malone's Liberty companies.[30] The first deal between Searchlight and Liberty Global was a joint venture that purchased a Puerto Rican cable company for $600 million in 2012.[31] Two years later, Searchlight and Liberty Global invested in

---

[26] *See, e.g.*, AB 82 (discussing Newhouse's "successful push to have Zinterhofer replaced as Chairman").

[27] *See* Loughman Decl., Ex. 38, at 103:11–24.

[28] *See, e.g.*, Cook Decl., Exs. 146, 147, 148.

[29] Loughman Decl., Ex. 59, at 25:5–9.

[30] *See infra* Section II.A.2.a.

[31] Loughman Decl., Ex. 59, at 34:17–35:12.

another Puerto Rican cable company for $272.5 million.[32]  In 2018, Zinterhofer became a director for Liberty LatAm, an entity spun off of Liberty Global in 2018.[33] Various sets of Charter Board minutes reflect that the affiliation between Searchlight and Malone was at least considered by the Board in connection with Zinterhofer's independence.[34]

The Plaintiffs have also aggregated facts about various transactions that overlapped with Malone-affiliated entities, on which transactions Zinterhofer worked in previous positions, including directorships.[35]  I consider these in further detail in my analysis below.

### b. Huseby

Although Huseby sat on Charter's Board as a Liberty Broadband designee, his primary employment was his position as CEO of Barnes & Noble at the pertinent time.[36]  Prior to becoming the CEO, Huseby had been the Chief Financial Officer ("CFO") of Barnes & Noble, a position he obtained after Maffei, who sat on the

---

[32] *Id.* at Ex. 59, at 42:18–43:25.
[33] *Id.* at Ex. 59, at 63:24–64:21; *id*. at Ex. 112, 143:21–144:2.
[34] *See, e.g.*, Cook Decl., Ex. 162, at 2 ("[A]s previously disclosed, Mr. Zinterhofer's firm, Searchlight Capital, was party to a joint venture investment in Puerto Rico with Liberty Global plc."); *see also id.* at Ex. 214, at 2 ("Mr. Cohen also reminded the Board that Mr. Zinterhofer's firm, Searchlight Capital, has a joint venture investment in Puerto Rico with Liberty Global [redacted] . . . .").
[35] *See infra* Section II.A.2.a.
[36] *See* Loughman Decl., Ex. 95, at 75:18–21; 78:14–79:5.

Barnes & Noble board of directors as a Liberty Media designee, referred him as a candidate for the position.[37]

Huseby had also previously served as an executive officer for two different companies at the same time that Malone sat on the boards of those companies: AT&T Broadband in "the early 2000s" and Cablevision in 2005.[38]

Huseby and Maffei have also overlapped to a minor extent personally, including memberships at a common country club as of 2015, and playing at least two rounds of golf together.[39]

Two Charter directors testified in depositions generally that they considered the Liberty Broadband designees, including Huseby, conflicted with respect to Liberty Broadband.[40]

Besides the above facts, the Plaintiffs also challenge Huseby's independence on basis of two email exchanges.[41] I consider these in further detail in the pertinent analysis section.

### c. Nair

Like Huseby, Nair was a Liberty Broadband designee at the pertinent time, but unlike Huseby, Nair was also employed by a Liberty company—Liberty

---

[37] *See id.* at Ex. 95, at 45:12–49:16; *see also* Compl. ¶ 48(f).
[38] *See* Loughman Decl., Ex. 95, at 64:10–16 (AT&T); 19:12–22:9 (Cablevision).
[39] *Id.* at Ex. 95, at 28:23–31:9.
[40] *Id.* at Ex. 59, 95:6–14 (Zinterhofer); *id.* at Ex. 93, 120:6–121:10 (Jacobson).
[41] *See infra* Section II.A.2.b.

Global.[42] Nair was then serving Liberty Global as the Executive Vice President and Chief Technology Officer ("CTO"),[43] a position that placed Nair in some physical proximity to Malone and Maffei—including not just working out of the same building, but attending certain annual business meetings at Malone's properties.[44]

Nair has given interviews which led him to speak about Malone; the pertinent quotes are discussed in detail in the analysis section of this Memorandum Opinion.[45]

As with Huseby, certain directors testified that they considered the Liberty Broadband designees, including, necessarily, Nair, conflicted with respect to Liberty Broadband.[46]

Finally, Nair sent at least one email to Maffei inquiring as to whether Maffei and Malone were on board with one of the proposed transactions at issue in this action.[47]

I consider all of these facts below.

---

[42] Cook Decl., Ex. 19, at 7.
[43] *See id.*
[44] Loughman Decl., Ex. 112, at 72:10–74:4; *id.* at Ex. 112, at 56:8–57:3; *id.* at Ex. 112, at 30:15–36:23.
[45] *See infra* Section II.A.2.c.
[46] *See supra* note 40 and accompanying text.
[47] Cook Decl., Ex. 212.

### d. Rutledge

Rutledge was the CEO and a director of Charter at the time of the challenged transactions,[48] such that Charter constituted Rutledge's primary employment.[49] Following the closings, Rutledge became the Chairman of the Charter Board, and he also received a new employment contract with increased compensation (though, perhaps, not in direct connection with the challenged transactions).[50]

Rutledge, like Nair, has given certain statements about Malone to the press that the Plaintiffs argue demonstrate a lack of independence.[51]

Finally, Rutledge was perceived as conflicted by at least one Charter director with respect to certain of the transactions at issue here, due to his position as Charter management.[52]

I undertake a full analysis of each of these facts later in this Memorandum Opinion.

### 2. Charter Attempts to Acquire TWC and Enters the Original Bright House Transaction

Charter began expressing interest in acquiring TWC in June 2013.[53] In preparation for a potential deal, Charter began to retain specialists, including

---

[48] *Sciabacucchi I*, 2017 WL 2352152, at *5.
[49] *See* Cook Decl., Ex. 66, at 32.
[50] *See id.* at Ex. 214, at 2; AB 73–74.
[51] *See infra* Section II.A.2.d.
[52] Loughman Decl., Ex. 8, at 97:25–98:10.
[53] *See, e.g.*, Cook Decl., Ex. 88 (June 18, 2013 meeting minutes of the Charter Board reflecting discussion of a potential combination with TWC).

retaining Goldman Sachs & Co. ("Goldman Sachs") and LionTree LLC ("LionTree") as financial advisors.[54] From the very beginning of the TWC pursuit, Charter was on notice that Liberty Broadband (then Liberty Media) would have an interest in providing equity "in the event that it was desirable to sell equity in any transaction."[55]

Charter made its first offer to acquire TWC on July 10, 2013.[56] TWC rejected the first offer within a day.[57] A few months later, prior to October 2, 2013, TWC's financial advisors reached out to Charter to indicate that TWC was open to discussing a potential acquisition.[58] Charter discussed the potential merger with TWC further at an October 17, 2013 Board meeting.[59]

Resolutions from that same Board meeting indicate that the Company was considering entering into an equity financing with Liberty Media as part of the TWC merger (the "2013 Resolutions").[60] The 2013 Resolutions indicated that the Liberty Media designees (Malone, Maffei, Huseby, and Nair) and Rutledge would recuse themselves for "all purposes in connection" with any such Liberty Media equity

---

[54] *Id.* at Ex. 89, at CHARTER00211325.
[55] *Id.* at Ex. 88, at CHARTER00211321.
[56] *Id.* at Ex. 92, at CHARTER00091707.
[57] *Id.* at Ex. 91, at CHARTERDIR00025463.
[58] *Id.* at Ex. 94, at CHARTER00211726.
[59] *Id.* at Ex. 99.
[60] *Id.* at Ex. 99, at Ex. A.

13

financing.[61]  The 2013 Resolutions also established a working group, composed of directors Zinterhofer, Markley, and Merritt, to negotiate any such equity financing.[62]

Shortly thereafter, on October 24, 2013, Charter made a second offer to TWC for mixed cash and stock consideration that it considered to represent a value of $127 per TWC share.[63]  TWC rejected the offer one week later.[64]

In January 2014, Charter released a public letter to TWC, making a third offer to acquire the company.[65]  TWC rejected the offer yet again.[66]

In February 2014, TWC and Comcast Corporation ("Comcast") announced that they had entered into a definitive merger agreement.[67]  Charter subsequently entered into certain subscriber swaps with TWC and Comcast, and a purchase agreement for the acquisition of a subsidiary to be spun off following the completion of the Comcast-TWC merger, both contingent upon the closing of the Comcast-TWC merger (the "Comcast-TWC Divestment Transactions").[68]  The Plaintiffs suggest that Charter's Board was "tak[ing its] cues" from Malone throughout these negotiations.[69]

---

[61] *See id.* at Ex. 99, at Ex. A.
[62] *See id.* at Ex. 99, at Ex. A.
[63] *Id.* at Ex. 100.
[64] *Id.* at Ex. 104.
[65] *Id.* at Ex. 6.
[66] *Id.* at Ex. 7.
[67] *Id.* at Ex. 8.
[68] *Sciabacucchi I*, 2017 WL 2352152, at *9.
[69] AB 20; *see also* Cook Decl., Ex. 125 (email from financial advisor describing Malone as "dominat[ing]" at least one phone call in April 2014).

Charter then turned its attention to acquiring a different cable company: Bright House.[70] Charter and Bright House began exploring their potential combination and negotiated drafts of term sheets "throughout the summer and into the fall."[71] In October 2014, Charter and Bright House shared the draft term sheet with Liberty Media, which provided comments.[72] Per the Plaintiffs, Maffei did not take kindly to the terms Charter and Bright House had negotiated, writing that the term sheet was "[r]idiculous . . . we are so far from accepting this."[73] The email chain is unclear, but Maffei's email appears to have been directed to Zinterhofer, who responded, "I will make that very clear[.]"[74]

After Maffei's team provided its comments, Charter and Bright House continued to negotiate the Bright House transaction, though Bright House's owner, Newhouse, evidently did not react positively to the Liberty Media comments.[75] After additional discussions, Maffei again put his foot down when the transaction was not taking shape as he had hoped: "Liberty [Media] has communicated its positions and as far as I'm concerned, we are done. If they're not acceptable . . . we should move on."[76]

---

[70] *Sciabacucchi II*, 2018 WL 3599997, at *3.
[71] *Sciabacucchi I*, 2017 WL 2352152, at *9.
[72] *Id.*
[73] Cook Decl., Ex. 155.
[74] *See id.* at Ex. 155.
[75] *Id.* at Ex. 181.
[76] *Id.* at Ex. 195.

After a few weeks of discussions, Maffei explained at a Charter Board meeting on March 5, 2015: "Liberty [Broadband] needed to retain a stake of at least 25% in [Charter], and to hold the largest voting stake, with a similar number of board seats, in order to avoid regulation under the Investment Company Act of 1940."[77]

Newhouse, Charter, and Liberty Broadband finally came to a structure that suited all involved on March 31, 2015 (the "Original Bright House Transaction").[78] That structure contemplated a $700 million Liberty Broadband investment in newly issued Charter shares.[79] The reference price for this investment was based on "the same 60-day weighted average price," $173, as that used in the acquisition of Bright House itself.[80]

The interested reader may question why the $700 million investment was desirable to Liberty Broadband—and why Liberty Broadband was as involved as they were in negotiating the Original Bright House Transaction. *Sciabacucchi I* touches upon the issue in some detail.[81] Per the Plaintiffs, for Liberty Broadband to avoid "devastating regulatory consequences," it needed to avoid regulation under the Investment Company Act of 1940 (the "'40 Act").[82] According to the Plaintiffs, the '40 Act contains a rebuttable presumption that a stockholder with 25% or greater

---

[77] *Id.* at Ex. 205.
[78] *Sciabacucchi I*, 2017 WL 2352152, at *9–10.
[79] *Id.*
[80] *Id.* at *9.
[81] *See id.* at *7–8.
[82] AB 11.

voting power is a controller and not a passive investor.[83] Thus, Liberty Broadband, which owned over 25% of Charter as of May 2014,[84] presumably wanted to avoid dilution under any version of the Bright House transaction. This is borne out by various evidence aggregated by the Plaintiffs, primarily emails from financial advisors,[85] and Maffei's statements at the March 5, 2015 Charter Board meeting.[86]

The Original Bright House Transaction was conditioned upon the completion of the Comcast-TWC Divestment Transactions.[87]

### 3. Charter Pursues the Acquisitions

The Comcast-TWC merger was terminated on April 24, 2015, due to an inability to overcome regulatory difficulties.[88] The Comcast-TWC Divestment Transactions and the Original Bright House Transaction would thus never come to fruition.[89]

---

[83] *Id.*
[84] Compl. ¶ 169.
[85] *See, e.g.*, Cook Decl., Ex. 157 (LionTree describing the voting arrangement to Charter as a "[k]ey issue"); *id.* at Ex. 139 (Charter CFO identifying Liberty Broadband's "need to maintain 25% for a period of time"); *id.* at Ex. 131 (internal LionTree emails stating that LionTree "need[s] to really figure out the 25% point for Liberty").
[86] *See supra* note 77 and accompanying text.
[87] *Sciabacucchi I*, 2017 WL 2352152, at *11.
[88] *Id.*
[89] *Id.*

Charter jumped right back into the ring to pursue TWC. On May 5, 2015, Charter made its fourth offer to acquire TWC.[90] Per the Plaintiffs' answering brief, this offer was rejected as well.[91]

At a May 4 Board meeting, the Charter Board affirmed its desire to re-paper a deal with Bright House on "substantially the same economic and governance terms as previously agreed."[92]

Thus began an exercise of threading the needle so that Charter could acquire both TWC and Bright House, while continuing to satisfy Liberty Broadband's stock ownership desires in conjunction with the '40 Act.

### a. The Broadband Transactions

As briefly mentioned before, Liberty Broadband had a demonstrated interest in ensuring that, following the accomplishment of any or all of Charter's acquisition activity, it remained a beneficial owner in excess of 25% of Charter's voting power.[93] In the Original Bright House Transaction, Liberty Broadband had negotiated a $700 million investment in Charter stock at the reference price to be paid in connection with the broader acquisition of Bright House.[94]

---

[90] AB 38; Loughman Decl., Ex. 37, at 144.

[91] AB 38. I cite to the answering brief because it is not clear to me from the proxy that this fourth offer was actually rejected, though the proxy *does* make clear that a second bidder had emerged and was similarly aggressively pursuing TWC. *See* Loughman Decl., Ex. 37, at 144.

[92] *Sciabacucchi I*, 2017 WL 2352152, at *11.

[93] *See supra* notes 81–86 and accompanying text.

[94] *See supra* note 80 and accompanying text.

Liberty Broadband clearly had interests in the potential acquisitions that differed from those of Charter. And LionTree, one of the financial advisors that had been retained by Charter at the beginning of the TWC pursuit in 2013, had previously received "substantial fees" from Liberty Broadband.[95] Per the Director Defendants, "the non-[Liberty] Broadband designee directors decided to rely only on Goldman Sachs for advice regarding a potential transaction between Charter and [Liberty] Broadband."[96] The Plaintiffs dispute whether this cordoning-off of LionTree actually occurred.[97]

Another consideration as Charter worked towards accomplishing the desired transactions in their totality was a corporate governance restriction contained in Article Eighth of Charter's certificate of incorporation, restricting business combinations between Charter and an "Interested Stockholder."[98] Liberty Broadband, by virtue of its ownership stake in Charter, was an "Interested Stockholder."[99] Article Eighth prohibits any business combination, including the issuance of securities, with Liberty Broadband unless two conditions are met: (1) a majority of "Continuing Directors," as defined in the Article, has to vote in favor of the business combination, and (2) a majority of stockholders entitled to vote

---

[95] Director Defs.' Opening Br. Supp. Their Mot. Summ. J. 18, Dkt. No. 306 [hereinafter "OB"].
[96] *Id.*
[97] *See, e.g.*, AB 15.
[98] *Sciabacucchi I*, 2017 WL 2352152, at *6; *see also* Loughman Decl., Ex. 5, at 11–15.
[99] *See Sciabacucchi I*, 2017 WL 2352152, at *6 (identifying stockholders in excess of 10% as interested stockholders).

19

(excluding the Interested Stockholder and any affiliates/associates) has to vote in favor of the business combination.[100]

The Charter Board had already determined to put the Bright House transaction back together on "substantially the same" terms, including economic terms, after the TWC-Comcast merger was terminated.[101] Liberty Broadband and Charter thus agreed that the terms of the Liberty Broadband investment in connection with any Bright House transaction would remain financially identical: Liberty Broadband would purchase $700 million worth of Charter shares at $173 per share.[102]

Charter then turned its attention towards designing a second Liberty Broadband equity investment that would allow Charter to acquire TWC without diluting Liberty Broadband's beneficial ownership stake in Charter.[103] The two companies ultimately agreed that Liberty Broadband would make an additional investment of $4.3 billion in Charter, to be priced "at a recent market price, on which the TWC transaction value was also based."[104] In the end, that price was $176.95 per share.[105]

The Plaintiffs also complain about the fact that Liberty Interactive Corporation ("Liberty Interactive") and Liberty Broadband (both TWC

---

[100] *See id.*
[101] *See supra* note 92 and accompanying text.
[102] *Sciabacucchi I*, 2017 WL 2352152, at *11.
[103] *See id.*
[104] *Id.*
[105] *See, e.g.*, *Sciabacucchi II*, 2018 WL 3599997, at *5.

stockholders) negotiated to receive, alone among all TWC stockholders, all stock consideration in exchange for their TWC shares as part of the Charter-TWC merger (such exchange right, the "Rollover").[106] This had certain tax benefits for the Liberty entities.[107]

The Plaintiffs also challenge certain governance considerations to be received by Liberty Broadband from Newhouse as part of the revisited Bright House transaction.[108]

Finally, the Plaintiffs complain of the price-per-share Liberty Broadband was due to pay in connection with each investment, "because it wasn't buying shares with closing risk."[109] That is, the Liberty Broadband investments were conditioned upon the closing of the new Bright House transaction and the TWC merger.[110]

The two Liberty Broadband investments—the $700 million investment in Charter at $173 per share, and the $4.3 billion investment in Charter at $176.95 per share—the Rollover and the governance considerations are collectively referred to in this Memorandum Opinion as the "Broadband Transactions."

---

[106] *Sciabacucchi I*, 2017 WL 2352152, at *11, *12.
[107] *See, e.g.*, Cook Decl., Ex. 247.
[108] Compl. ¶ 4(d).
[109] AB 2.
[110] The Plaintiffs make this point multiple times in their answering brief, but do not point me to the exact portions of the transaction documents that support the statement. *See, e.g., id.* Based on a review of the proxy, the citations appear to be the following: Loughman Decl., Ex. 37, at C-17 (Bright House investment); *id.* at Ex. 37, at D-10 (TWC investment).

## b. The Bright House and TWC Mergers

On May 21, 2015, the Charter Board authorized a fifth offer for TWC, offering a consideration election to TWC stockholders between either $100 in cash and 0.5409 shares in Charter per TWC share, or $115 in cash and 0.4562 shares in Charter per TWC share.[111] TWC called Charter later that same day to inform Charter that TWC "was authorized to proceed" with the fifth offer.[112]

In the meantime, a slightly altered Bright House transaction had been negotiated.[113]

Charter's Board then met to consider the final-form transactions.[114] The Board had been provided with a set of draft resolutions drafted by legal counsel containing approvals for each of the proposed transactions—the Broadband Transactions, the updated-form Bright House transaction, and the TWC transaction (collectively, the "Acquisitions").[115] Liberty Broadband designees voted "in favor of all of the resolutions previously circulated to the Board."[116] Those directors, along with financial advisor LionTree, then left the Board meeting.[117] The

---

[111] *Sciabacucchi I*, 2017 WL 2352152, at *12.
[112] *Id.*; *see also* AB 47.
[113] *See Sciabacucchi I*, 2017 WL 2352152, at *13.
[114] *Id.* at *12.
[115] *See* Cook Decl., Ex. 262.
[116] *Id.* at Ex. 266.  Malone was not in attendance.  *See* Compl. ¶ 290.
[117] Cook Decl., Ex. 266.

22

remaining directors received a presentation from Goldman Sachs and engaged in discussions.[118]

The meeting minutes taken from this last Board meeting do not reflect a vote by the non-Liberty Broadband directors with respect to the Acquisitions.[119] Contemporaneous hand-written notes taken by Charter's assistant corporate secretary *do* reflect a vote by the non-Liberty Broadband directors to approve the Acquisitions.[120] Relatedly, the draft resolutions circulated to the Charter Board were evidently never finalized.[121] Despite this, contemporaneous emails indicate that the Charter Board (including the non-Liberty Broadband directors) had fully approved the Acquisitions.[122]

Charter filed a definitive proxy statement (the "proxy") with the Securities and Exchange Commission relating to the Acquisitions and soliciting a stockholder vote.[123] Notably, the stockholders were asked to approve the Acquisitions and separately to approve the Broadband Transactions; the Board structured the vote, however, so that consummation of the Acquisitions was dependent upon stockholder

---

[118] *Id.* at Ex. 266.

[119] *Id.* at Ex. 266.

[120] Transmittal Aff. of Paul J. Loughman Supp. Director Defs.' Reply Further Supp. Their Mot. Summ. J., Ex. 122, at CHARTER00211963, Dkt. No. 336 [hereinafter "Loughman Reply Decl."].

[121] *See* AB 54.

[122] Loughman Reply Decl., Ex. 123 (email from Rutledge at 12:36 a.m. on May 24th stating that "board approvals are all complete"); *id.* at Ex. 124 (email from Winfrey at 2:01 a.m. on May 24th stating that the "board fully approved by the way.").

[123] *Id.* at Ex. 37.

approval of the Broadband Transactions.[124]  It was this structure I found coercive for *Corwin* purposes in *Sciabacucchi I*.[125]

In September 2015, the Charter stockholders approved the Acquisitions, and the TWC merger and Bright House transactions closed on May 18, 2016.[126]

\* \* \*

All told, the Plaintiffs' suit here challenges *only* the Broadband Transactions, rather than the broader Acquisitions.[127]  That is, the Plaintiffs do not challenge either the TWC merger or the Bright House acquisition,[128] which they agree were a "home run" for Charter.[129]

As outlined above, the complained-of Broadband Transactions consist of four parts: (1) the Bright House acquisition-linked $700 million investment in Charter at a reference price of $173 per share; (2) the TWC merger-linked $4.3 billion investment in Charter at a reference price of $176.95 per share; (3) the Rollover, allowing Liberty Broadband and Liberty Interactive to obtain a tax benefit unavailable to other TWC stockholders in connection with the TWC merger; and (4) certain governance considerations afforded to Liberty Broadband in connection with

---

[124] *Sciabacucchi I*, 2017 WL 2352152, at *21–22.
[125] *Id.* at *24.
[126] *Sciabacucchi II*, 2018 WL 3599997, at *5.
[127] Compl. ¶¶ 3–4.
[128] *Id.* ¶ 2.
[129] AB 1 (quoting OB 1).

the final Bright House transaction.[130]  The Plaintiffs' position is that none of these agreements were entirely fair.[131]

*B. Procedural History*

The original complaint in this action was filed in August 2015, along with a motions to expedite and for a preliminary injunction.[132]  That complaint alleged, among other things, that the proxy Charter had filed in connection with the Acquisitions was materially incomplete.[133]  Following those filings, Charter made certain supplemental disclosures, and Plaintiff Sciabacucchi withdrew his motions to expedite and for preliminary injunction.[134]  Plaintiff Sciabacucchi filed an amended complaint in April 2016 (the "First Amended Complaint").[135]

Two motions to dismiss were filed against the First Amended Complaint, one brought by the "Charter Defendants"—i.e., Charter and all of its directors as of the Acquisitions, excepting Malone and Maffei,[136] and one brought by the "Liberty

---

[130] *See, e.g.*, Compl. ¶¶ 19–22.

[131] *See, e.g.*, *id*.  The Plaintiffs' challenged transactions appear to have expanded just slightly following *Sciabacucchi II* and following a second amendment to their original complaint. *Sciabacucchi II*, 2018 WL 3599997, at *5; *see also* Compl. ¶ 4. *Sciabacucchi II* listed the same four categories of challenged transactions but restricted the governance considerations solely to Liberty Broadband's receipt of a voting proxy from Newhouse. *See Sciabacucchi II*, 2018 WL 3599997, at *4–5.

[132] Verified Class Action Compl. for Breach of Fiduciary Duties, Dkt. No. 1; Mot. for Prelim. Inj., Dkt. No. 1; Mot. for Expedited Proceedings, Dkt. No. 1.

[133] *Sciabacucchi I*, 2017 WL 2352152, at *13.

[134] *See id.*; *see also* Letter dated Sept. 10, 2015, to Sam Glasscock III from Melissa N. Donimirski Regarding Withdrawal of Pl.'s Mot. to Expedite and Mot. for Prelim. Inj. 2, Dkt. No. 12.

[135] Verified Am. Class Action Compl., Dkt. No. 15.

[136] Charter Defs.' Mot. to Dismiss the Verified Am. Class Action Compl., Dkt. No. 25.

25

Broadband Defendants"—Liberty Broadband, Malone, and Maffei.[137] I addressed these motions to dismiss in two separate memorandum opinions. The first, *Sciabacucchi I*, held that (1) Malone and Liberty Broadband, collectively, were not controllers of Charter at the pertinent time; and (2) that any potential breaches of fiduciary duty were not cleansed by the stockholder vote under *Corwin*, because the First Amended Complaint had adequately alleged that the stockholder vote upon the Acquisitions was structurally coerced, as the broader Acquisitions were conditioned on a stockholder vote in favor of the Broadband Transactions.[138] I did not make holdings as to director independence in *Sciabacucchi I*, other than to say that even if a majority of the Charter Board lacked independence (which Plaintiff Sciabacucchi had argued), this would not be sufficient to show that Liberty Broadband and Malone controlled Charter.[139]

*Sciabacucchi I* ultimately reserved decision on the motions to dismiss, pending supplemental briefing on the question of whether Plaintiff Sciabacucchi's

---

[137] The Liberty Broadband Defs.' Mot. to Dismiss the Verified Am. Class Action Compl., Dkt. No. 22. I do not use these terms in the remainder of this Memorandum Opinion.
[138] *See generally Sciabaccuchi I*, 2017 WL 2352152; *see also Sciabacucchi II*, 2018 WL 3599997, at *6.
[139] *Sciabacucchi I*, 2017 WL 2352152, at *17–18.

26

claims were direct or derivative.[140]  I resolved the remainder of the motions to dismiss in *Sciabacucchi II* on July 26, 2018.[141]

*Sciabacucchi II* found that the two remaining claims were solely derivative in nature because of the lack of a controlling stockholder.[142]  Because the claims were derivative, I then assessed whether the First Amended Complaint had satisfied Court of Chancery Rule 23.1 in pleading demand futility.[143]  To satisfy Rule 23.1, Plaintiff Sciabacucchi needed to have alleged particularized facts showing that demand would have been futile because at least half of Charter's Board lacked independence from Malone, who was interested in the Broadband Transactions.[144]

I therefore undertook an independence analysis in the context of demand futility with respect to three of the directors.[145]  I found that directors Nair, Rutledge, and Zinterhofer lacked independence in the context of demand futility—that is, in the context of a decision whether to sue Malone—and that demand was consequently

---

[140] *Id.* at *24–25.  That briefing was provided, and Plaintiff Sciabacucchi conceded in that briefing that two counts in the First Amended Complaint were predicated upon the allegation that Liberty Broadband and Malone controlled Charter.  *Sciabacucchi II*, 2018 WL 3599997, at *6.  Those two counts were dismissed in *Sciabacucchi II*.  *See generally id.*

[141] *See generally Sciabacucchi II*, 2018 WL 3599997.

[142] *Id.* at *7–10.  *Sciabacucchi II* involved analysis of the direct and/or derivative nature of Plaintiff Sciabacucchi's claims at length, an issue no longer pertinent to our law following the Delaware Supreme Court's holdings in *Brookfield Asset Mgmt. v. Rosson.  See generally* 261 A.3d 1251 (Del. 2021).

[143] Ct. Ch. R. 23.1.

[144] *Sciabacucchi II*, 2018 WL 3599997, at *10–11.

[145] *Id.* at *10–15.  The Defendants had conceded that Malone and Maffei lacked independence, and therefore only three further directors needed to lack independence for the purposes of demand futility in order for Plaintiff Sciabacucchi to demonstrate that demand was excused.  *See id.* at *12.

27

excused.[146] With respect to Nair, I found that he lacked independence in the demand futility context primarily due to his employment at a separate Liberty entity (Liberty Global), of which Malone was a 25% stockholder.[147] For Rutledge's part, I found that he lacked independence to consider a demand impartially largely due to his status as a "highly compensated senior executive at Charter," where Malone (via Liberty Broadband) controlled 26% of the voting stock.[148] Finally, as to Zinterhofer, I found that he lacked independence for purposes of demand futility principally because of his outside business relationships with Malone, particularly those pertaining to joint ventures in Puerto Rico.[149] I did not address Huseby's independence at the motion to dismiss stage.

*Sciabacucchi II* also separately found that the First Amended Complaint pled a viable claim for breach of fiduciary duty by the Charter directors, and that entire fairness applied to the transactions at issue at the pleading stage.[150]

Following *Sciabacucchi II*, a second plaintiff joined the action via stipulation in November 2019;[151] the parties also began engaging in significant discovery at this time. The Plaintiffs then moved for leave to amend the First Amended Complaint

---

[146] *See id.*
[147] *See id.* at *12–13.
[148] *Id.* at *13.
[149] *Id.* at *13–14.
[150] *Id.* at *15–16.
[151] *See* Granted (Stipulation and Proposed Order Regarding Joinder of Hialeah Employees' Retirement System), Dkt. No. 136.

in January 2021.[152] That motion was opposed, and following briefing, I granted it in part and denied it in part by Memorandum Opinion in August 2021 (*Sciabacucchi III*).[153] The second amended complaint (the "Complaint") was filed in September 2021,[154] following which the Defendants filed answers;[155] thereafter, the Defendants moved for summary judgment.[156] Briefing followed, and I heard oral argument on the motions for summary judgment on January 19, 2022.[157] This Memorandum Opinion addresses both the Director Defendants' motion for summary judgment (the "Director Defendants' Motion") and Liberty Broadband's motion for summary judgment.

## II. ANALYSIS

The standard of review upon a motion for summary judgment is well known. Per Court of Chancery Rule 56(c), if the evidence, taken together, shows that there is "no genuine issue as to any material fact," and if the moving party is "entitled to a judgment as a matter of law," summary judgment may be entered.[158] As the

---

[152] Mot. for Leave to File Verified Second Am. Derivative and Class Action Compl., Dkt. No. 247.
[153] *See generally Sciabacucchi v. Malone*, 2021 WL 3662394 (Del. Ch. Aug. 18, 2021).
[154] Compl.
[155] Answer of Defs. Liberty Broadband Corp., John Malone, and Gregory Maffei to Verified Second Am. Derivative Compl., Dkt. No. 299; Nominal Def. Charter Communications, Inc.'s Answer to the Verified Second Am. Derivative Compl., Dkt. No. 300; The Director Defs.' Answer to the Verified Second Am. Derivative Compl., Dkt. No. 301.
[156] Director Defs.' Mot. for Summ. J., Dkt. No. 306; Liberty Broadband Corp.'s Mot. for Summ. J., Dkt. No. 309.
[157] *See* Tr. of 1.19.22 Oral Arg. on Defs' Mots. for Summ. J., Dkt. No. 344 [hereinafter "Oral Arg."].
[158] Ct. Ch. R. 56(c).

29

Delaware Supreme Court has noted, "[t]here is no right to summary judgment."[159] In fact, summary judgment "must . . . be denied if there is a dispute regarding the inferences which might be drawn from the facts."[160] The evidence must be construed "in the light most favorable to the non-moving party."[161] Any motion for summary judgment should be denied "if there is any reasonable hypothesis by which the opposing party may recover."[162]

Summary judgment is inappropriate where the matter "depends to any material extent upon a determination of credibility."[163] When a party's state of mind is at issue, "a credibility determination is 'often central to the case.'"[164] "The test is not whether the judge considering summary judgment is skeptical that [the non-movant] will ultimately prevail."[165] If, upon review of the facts presented in support of a summary judgment motion, the court determines that it is desirable to develop the facts more thoroughly at trial to aid in the application of the law, the court may deny summary judgment.[166] However, the United States Supreme Court, construing Rule 56(c) of the Federal Rules of Civil Procedure, has noted that summary

---

[159] *Empire of Am. Relocation Servs., Inc. v. Com. Credit Co.*, 551 A.2d 433, 435 (Del. 1988) (citing *Cross v. Hair*, 258 A.2d 277, 278 (Del. 1969)).

[160] *See id.* (citing *Schagrin v. Wilmington Med. Ctr., Inc.*, 304 A.2d 61, 63 (Del. Super. 1973)).

[161] *See In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992)).

[162] *Id.* (citing *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

[163] *Id.* (citing *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002)).

[164] *Id.* (citing *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002)).

[165] *Cerberus Int'l*, 794 A.2d at 1150.

[166] *In re El Paso*, 2014 WL 2768782, at *9.

judgment is appropriately granted "even where 'colorable . . . or [in]significantly probative [evidence]' is present in the record, if no reasonable trier of fact could find for the plaintiff on that evidence."[167]

The Director Defendants have presented me with two major bases on which to grant their motion for summary judgment. First, they ask me to find based upon the record that has been developed that a majority of Charter's Board at the time of the vote upon the Acquisitions (including the Broadband Transactions) was independent, and that the appropriate standard of review is thus the business judgment rule. Second, alternatively, they argue that even if the Broadband Transactions are subject to review under entire fairness, they have adduced a record that demonstrates both fair process and fair price, as a matter of law.

Liberty Broadband's motion for summary judgment largely rises and falls with the Director Defendants' Motion, as the cause of action against Liberty Broadband is for aiding and abetting breach of fiduciary duty. If the Director Defendants succeed in demonstrating that a majority of the Board was independent and disinterested, Liberty Broadband might prevail upon its motion. If the Director Defendants are unable to prevail as to fiduciary duty at this stage, Liberty Broadband will likely be unable to overcome that finding as well.

---

[167] *Haft v. Haft*, 671 A.2d 413, 419 (Del. Ch. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).

Because vindication of the Director Defendants' independence theory would relieve me of the need to address entire fairness, I assess independence first.

*A. The Independence Analysis*

In order for the Director Defendants to prevail upon a motion for summary judgment, they must show that a majority of the Charter Board was independent[168] such that the independent directors could bring their business judgment to bear in the context of voting upon the Acquisitions, including the Broadband Transactions. This differs from the independence inquiry I undertook at the motion to dismiss stage, wherein the Plaintiffs showed that it was reasonably conceivable that a majority of the Charter Board would have had its discretion sterilized in responding to a demand for litigation, including against fellow directors.[169] To repeat, the inquiry here is whether, for purposes of *voting sterilization*—which differs from assessing a demand—a majority of the Charter Board was independent in assessing the Acquisitions.

This Court has addressed the contextual nature of the independence inquiry in some detail in *In re Oracle Corporation Derivative Litigation*, a Court of Chancery

---

[168] The parties have not disputed whether Nair, Huseby, Rutledge, or Zinterhofer was interested in the transaction. As I acknowledged in *Sciabacucchi II*, Malone was indisputably interested, but the Director Defendants do not champion his independence here. *See Sciabacucchi II*, 2018 WL 3599997, at *11.

[169] *Id.* at *10–15.

case from 2003.[170] In *Oracle*, before addressing the independence of a special litigation committee, the Court stated:

> It is, I daresay, easier to say no to a friend, relative, colleague, or boss who seeks assent for an act (*e.g.*, a transaction) that has not yet occurred than it would be to cause a corporation to sue that person . . . . Denying a fellow director the ability to proceed on a matter important to him may not be easy, but it must, as a general matter, be less difficult than finding that there is reason to believe that the fellow director has committed serious wrongdoing and that a derivative suit should proceed against him.[171]

Notably, independence in the context of a special litigation committee is even more demanding, as directors on a special litigation committee *do not* enjoy the presumption of independence; rather, the directors composing the committee have the burden of establishing their own independence.[172]

Despite this distinction, at least two Delaware cases have followed *Oracle*'s proclamation outside of the special litigation committee context. *In re BGC Partners, Inc. Derivative Litigation* noted that a demand futility analysis is an "exercise in the hypothetical," and that "[a] director's objectivity concerning a hypothetical demand could be compromised even if her actions in evaluating a transaction were beyond reproach."[173] The Court quoted *Oracle* approvingly,

---

[170] *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917 (Del. Ch. 2003).
[171] *Id.* at 940.
[172] *See London v. Tyrrell*, 2010 WL 877528, at *12–13 (Del. Ch. Mar. 11, 2010); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004).
[173] *In re BGC Partners, Inc. Deriv. Litig.*, 2021 WL 4271788, at *11 (Del. Ch. Sept. 20, 2021).

agreeing that a director "faces greater difficulty" in assessing a demand than he does in denying a fellow director "the ability to proceed on a matter important to him."[174]

The Delaware Supreme Court has also indirectly addressed the issue of contextual precision in undertaking an independence inquiry. In *Marchand v. Barnhill*, the Court reviewed a determination the lower court had made as to an individual's independence.[175] The lower court, in that instance, had concluded that because the questioned director had voted contrary to the interested party "on a proposal to separate the CEO and Chairman position," certain interpersonal ties "did not matter" for purposes of assessing the director's independence in the demand futility context.[176] The Delaware Supreme Court disagreed: "the decision whether to sue someone is materially different and more important than the decision whether to part company with that person on a vote about corporate governance, and . . . precedent recognizes that the nature of the decision at issue must be considered in determining whether a director is independent."[177]

This review of caselaw crystallizes the importance of assessing independence in a precise factual context. Acknowledging these distinctions, then, what can the reader take away from the above discussion of independence as applied to a vote for

---

[174] *Id.* at *11. I do note that *In re BGC Partners* undertook this explanation in the context of assessing a *Cornerstone* claim—so although the context is similar to the case before me, it is not identical. *See id.* at *10–12.
[175] *Marchand v. Barnhill*, 212 A.3d 805, 819 (Del. 2019).
[176] *Id.*
[177] *Id.*

34

or against major transactions? Caselaw appears to be—slowly—coalescing as follows.

Where the independence inquiry relates to special litigation committees, it requires a showing of independence *by the special litigation committee*, having displaced the common-law presumption of director independence.[178] This differs dramatically from the other two contexts considered above.

The independence inquiry as it relates to demand futility arises in the context where the challenged directors are not themselves interested in the question posed in the demand, but are alleged not to be independent of those who are. Where the latter are fellow directors, the required demonstration appears to be the easiest for a plaintiff to clear, given the natural reluctance of directors to take the action demanded—ultimately, choosing to sue fellow directors. If, as *Oracle* suggests, the difficulty of impartially assessing a demand to sue fellow board members (or to sue business associates, friends, family, etc.), is high, it follows that a plaintiff would find it easier to impugn a director's independence in the context of demand futility. Successfully impugning a director's independence with respect to voting on *transactions*, conversely, should be more difficult than challenging that same independence with respect to assessing a demand. The ultimate factual burden upon a plaintiff to prove a director's lack of independence at trial will vary accordingly.

---

[178] *See supra* note 172 and accompanying text.

35

The important point is that the decision in question must be viewed in the context of the director's relationship and her ability, in light of that relationship, to apply her business judgment thereto.

I have found, at the pleading stage, that Plaintiff Sciabacucchi had alleged sufficient facts to determine not only that demand was excused, but that the business judgment of a majority of the directors was sufficiently impugned to make it reasonably conceivable that entire fairness must be the standard of review upon a motion to dismiss.[179] The question before me today stands in a different procedural context: that of summary judgment. Director independence law creates friction with the summary judgment standard, as "there is a presumption that directors are independent."[180] At the same time, the Court must recall that the facts "are viewed in the light most favorable to the nonmoving party" on a motion for summary judgment.[181] Thus, though I start from the presumption of independence in assessing each challenged director, I remain cognizant that any interpretative gloss on facts must benefit the Plaintiffs. To grant summary judgment, the record must be such that I find that the Plaintiffs cannot meet their burden to rebut independence at trial, as a matter of law.

---

[179] *See supra* note 150 and accompanying text.
[180] *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).
[181] *In re Energy Transfer Equity L.P. Unitholder Litig.*, 2017 WL 782495, at *9 (Del. Ch. Feb. 28, 2017).

With this framework in mind, then, I address the facts before me. The Charter Board consisted of ten directors at the time of the vote on the Acquisitions. Four of these directors—Conn, Markley, Merritt, and Jacobson—have not been challenged by the Plaintiffs on independence grounds[182] at summary judgment. The Director Defendants have conceded that two more of the directors—Malone and Maffei, dual fiduciaries—were not independent.[183]

To show the independence of a majority of the Board, and obtain the business judgment rule standard of review, the Director Defendants must establish that six of the ten directors on Charter's Board were independent at the pertinent time. That leaves a dispute over the independence of Nair and Huseby, both Liberty Broadband designees; Rutledge, the CEO at the time of the Acquisitions; and Zinterhofer, the Chairman at the time of the Acquisitions. If the Director Defendants can show that the record compels me to find two of the four challenged directors were independent, the Director Defendants are entitled to the judgment they seek.

To displace the presumption of independence, the Plaintiffs must demonstrate as to each challenged director that he was either (1) beholden to Malone, Maffei, or Liberty Broadband or (2) so under the influence of Malone, Maffei, or Liberty

---

[182] The Plaintiffs do not contend that a majority of the Board was interested in the Acquisitions, including the Broadband Transactions.

[183] *See supra* note 145.

Broadband that his discretion was sterilized.[184] "Delaware law does not contain bright-line tests for determining independence but instead engages in a case-by-case fact specific inquiry based on" the facts.[185] Facts submitted to rebut the presumption of independence should be reviewed "holistically, because they can be additive."[186] Plaintiffs seeking to show that a director was not independent must demonstrate that the director in question had ties to the "person whose proposal or actions he or she is evaluating;" ties so substantial that she could not "objectively discharge . . . her fiduciary duties."[187] The inquiry is whether those ties were material such that they displace the impartiality of the individual director.[188] Only if, in light of the record that has been adduced, I can find that the Plaintiffs will be unable to demonstrate a lack of independence as to a majority of the Board, can I grant the Director Defendants' motion here.

Before I turn to facts relating to the individual directors, I briefly address what the Plaintiffs consider predicate issues which could lead to application of entire fairness without a finding of lack of directorial independence.

---

[184] *Kahn*, 88 A.3d at 648–49.
[185] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015).
[186] *Voigt v. Metcalf*, 2020 WL 614999, at *13 (Del. Ch. Feb. 10, 2020).
[187] *Kahn*, 88 A.3d at 649.
[188] *Id.*

### 1. The Plaintiffs' Predicate Issues

Per the Plaintiffs, acceptance of any one of these three predicate-issue theories would require the application of the entire fairness standard of review,[189] eliminating the need to assess independence director-by-director. They challenge (1) whether the Acquisitions were in fact approved by the full Board, and particularly whether the non-Liberty Broadband directors voted in favor of the Acquisitions;[190] (2) whether fraud on the Board occurred in the context of a financial advisor, LionTree;[191] and (3) whether a set of Board resolutions from 2013 conclusively establishes a lack of independence as to certain directors.[192] Because of my decision, below, that the issue of independence of a majority of the board awaits trial, I see no benefit in addressing these arguments here, rather than on a post-trial record. Nonetheless, it is worth laying out the Plaintiffs' argument with respect to one of these issues, involving the "2013 Resolutions," as these facts are integral to the independence inquiry that follows.

In 2013, the Charter Board geared up to make the first of many offers to buy TWC. As described in the facts section, Charter made and TWC rejected four offers

---

[189] The result if I accept at least one of the predicate-issue theories is disputed. *See* Director Defs.' Reply Further Supp. Their Mot. Summ. J. 18, Dkt. No. 335. [hereinafter "RB"] (reflecting Director Defendants' belief that if the Acquisitions were not approved, the transactions would be void).

[190] AB 59–62.

[191] *Id.* at 82–85.

[192] *Id.* at 64–65; Oral Arg. at 100:1–8, 107:4–13. I do note that this argument is championed less thoroughly in the Plaintiffs' briefing, but I still understand its presentation to be that of a predicate issue.

before the fifth was accepted. The first Charter proposal was made on July 10, 2013. Before the second proposal was made, on October 17, 2013, Charter held a Board meeting.[193] At that meeting, the Board voted on and approved a set of resolutions outlining a potential equity transaction with Liberty (defined above as the "2013 Resolutions").[194] The 2013 Resolutions read in part:

> **WHEREAS,** the Company is contemplating the possibility of a strategic business combination that may involve an equity financing, and Liberty Media has advised the Board that it is considering to propose an additional investment in the Company (an "Equity Transaction");
>
> **WHEREAS,** the four directors previously designated for appointment to the Board by Liberty Media (the "Liberty Directors") and Mr. Rutledge have advised the Board that they will recuse themselves for all purposes in connection with any such Equity Transaction;[195]

The 2013 Resolutions go on to identify the remainder of the Board as "Remaining Directors," and to empower the Remaining Directors to explore such an equity transaction.[196] The four "Liberty" directors recused by the 2013 Resolutions are Malone, Maffei, Nair, and Huseby.

---

[193] Cook Decl., Ex. 99.

[194] *Id.* at Ex. 99, at Ex. A. The reference to "Liberty" above the line is intentional, as the Liberty entity in question was actually Liberty Media, rather than Liberty Broadband. *See id.* at Ex. 99, at Ex. A.

[195] *Id.* at Ex. 99, at Ex. A.

[196] *Id.* at Ex. 99, at Ex. A.

40

The 2013 Resolutions are pertinent because, per the Plaintiffs, they indicate that the "Charter Board recognized" that Malone, Maffei, Nair, Huseby, and Rutledge "were conflicted."[197] The implication is that they therefore lacked independence for purposes of any equity transaction undertaken by Charter with Liberty Media/Broadband. In theory, no further independence inquiry is necessary, and I should proceed directly to the application of the entire fairness standard of review.

I do not find the issue to be this straightforward. The 2013 Resolutions identify the recused directors (with the exception of Rutledge) as "the four directors previously designated for appointment to the Board by Liberty Media."[198] No further factual finding regarding Malone, Maffei, Nair, and Huseby is delineated; the recusal appears to be solely due to their status as Charter Board designees of Liberty. This is not sufficient to foreclose a further independence analysis, as Delaware law does not recognize designee status as sufficient in itself to demonstrate a director's lack of independence as relates to the designating entity, and the presumption of independence continues to apply to designee directors, unless rebutted.[199] In addition, and pertinent to the further independence inquiry I engage

---

[197] Oral Arg., at 110:10–15; 110:19–111:20; 107:4–13.
[198] Cook Decl., Ex. 99, at Ex. A.
[199] *Rudd v. Brown*, 2020 WL 5494526, at *12 (Del. Ch. Sept. 11, 2020) (citing *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *15 (Del. Ch. May 22, 2000)).

with below, the 2013 Resolutions are not reflective by their plain language of a *determination by the Company* as to any conflict or lack of independence on the part of the enumerated directors.[200]   Rather, they are cast as an action by these five directors (the decision to recuse themselves).[201]

In other words, the 2013 Resolutions are pertinent to, but not dispositive of, the question of independence.

### 2. Director-by-Director Assessment Upon the Summary Judgment Standard

I now turn to the director-by-director independence inquiry, ultimately determining that I must deny the Director Defendants' Motion at summary judgment.

Below I address the facts aggregated with respect to each of the contested directors: Zinterhofer, Huseby, Nair, and Rutledge.  I am aided in this by the parties' briefing, which disputes almost none of the facts regarding each contested director's independence, but disputes primarily *inferences to be drawn* from the aggregated facts.

### a. Zinterhofer

Eric Zinterhofer was the Chairman of the Board prior to the Acquisitions.[202]

---

[200] Cook Decl., Ex. 99, at Ex. A.
[201] The placement of the recusal in a whereas clause as opposed to a resolution also offers minor support to this view.  *See id.* at Ex. 99, at Ex. A.
[202] *Id.* at Ex. 19, at 7.

The gravamen of the Plaintiffs' allegations against Zinterhofer is that he has a history of engaging in business transactions with "Malone-affiliated entities."[203] Most importantly, Zinterhofer co-founded a private equity firm, Searchlight, in 2010.[204] From 2013 to 2015, Zinterhofer was the owner of "approximately" 30% of Searchlight.[205] In 2012, Searchlight, as part of a joint venture with Liberty Global, purchased a Puerto Rican cable company for $600 million.[206] Searchlight itself recognized in an internal presentation that "Searchlight's multi-year relationships with prior owners of LCPR (Liberty Global) and OneLink (MidOcean and Crestview) allowed for *noncompetitive transaction . . . .*"[207] Zinterhofer testified that this reference alluded to people at Searchlight who had known some of the Liberty Global principals, including Mike Fries, for many years.[208] When asked, he indicated that the folks at Searchlight who knew Liberty Global principals were "[p]rimarily" himself and one other partner.[209]

---

[203] AB 75.
[204] *See* Loughman Decl., Ex. 59, at 25:5–9.
[205] *Id.* at Ex. 59, at 26:3–27:23 ("Q. Is it true that in the 2013 to 2015 time frame you owned approximately 30 percent or at times a little more of Searchlight? A. Yeah. There's different percentages . . . . for different elements of ownership across the firm. So it's not entirely accurate to say that it's just 30% across the board."). Zinterhofer clarified that it would not be wholly accurate to say he was a 30% holder of Searchlight, but that it was "approximately correct" "for purposes of this conversation" to say that from 2013 to 2015 his ownership of the general partner entity of Searchlight was 30% or greater. *See id.* at Ex. 59, at 26:3–27:23.
[206] *See id.* at Ex. 59, at 34:5–35:12.
[207] *Id.* at Ex. 59, at 35:21–24, 39:25–40:7 (emphasis added).
[208] *See id.* at Ex. 59, at 39:25–40:23.
[209] *See id.* at Ex. 59, at 39:25–40:23.

Two years later, in 2014, Liberty Global and Searchlight invested in another Puerto Rican cable company for $272.5 million.[210]  In June 2015, Searchlight published a piece on its website that described, among other things, Searchlight's relationship with Liberty Global (the "June 2015 Article").[211]  Mike Fries, the CEO of Liberty Global at the time, stated in the story that he had known Zinterhofer "well over 10 years," that Zinterhofer was a "critical and valuable resource" to Liberty Global as it engaged in the two acquisitions, and that "[w]e [Liberty Global] would be happy to do more deals with Searchlight."[212]

In 2018, Zinterhofer became a director for Liberty LatAm—an entity spun off of Liberty Global in 2018.[213]

Zinterhofer considered himself to owe "fiduciary type obligations" to Searchlight (with respect to the Searchlight investment realm),[214] and (per the Plaintiffs) likely felt a personal motivation to prove himself as a co-founder and therefore would have wanted to show a good return.[215]  The parties both proffer a host of arguments regarding the materiality of Searchlight as a venture to Zinterhofer comparative to his overall wealth, and comparative to the overall Searchlight

---

[210] *Id.* at Ex. 59, at 42:18–43:25.
[211] Cook Decl., Ex. 56.; *see also* Loughman Decl., Ex. 59, at 55:4–17.
[212] Cook Decl., Ex. 56.
[213] Loughman Decl., Ex. 59, at 64:13–21; *id.* at Ex. 112, 143:21–144:2.
[214] *Id.* at Ex. 59, at 31:8–14.
[215] Oral Arg. at 116:17–21.

fund.[216]  The Plaintiffs indicate that the Searchlight joint venture was material to Zinterhofer[217] while the Director Defendants highlight that the venture accounted for less than 1% of Zinterhofer's net worth.[218]

Another fact relating to Zinterhofer's lack of independence is that the Board at least *considered* whether Zinterhofer was potentially conflicted in light of the affiliation between Searchlight and Malone, as enshrined in meeting minutes.[219]  But there are not specific facts cited suggesting that Malone exerted significant influence over Zinterhofer by way of Liberty Global or Liberty LatAm.

In prior jobs, Zinterhofer had engaged in transactions or preliminary discussions with other Malone-affiliated entities.  For example, while at Apollo Management, L.P., Zinterhofer worked on a 2005 transaction selling CableCom to

---

[216] *See* AB 77–78; OB 39; RB 8–10.

[217] AB 78 ("As of June 2015, Zinterhofer's personal share of the unrealized gain in the Puerto-Rico joint-venture entity was approximately $886,000, compared to an annual income for 2014 and 2015 of as little as $5 million.").

[218] RB 8–9 ("There is, moreover, no evidence that the joint venture was material to Searchlight or to Zinterhofer: the investment comprised less than 3% of Searchlight's total funds as of December 2015, and Zinterhofer personally invested less than 1% of his net worth in the venture.").  Weighing facts would be inappropriate at this stage, so I do not make a dispositive finding with respect to the question of the materiality of the joint venture to Zinterhofer.  It is enough to consider the facts as part of my holistic review of Zinterhofer's independence.

[219] *See, e.g.*, Cook Decl., Ex. 162, at 2 ("[A]s previously disclosed, Mr. Zinterhofer's firm, Searchlight Capital, was party to a joint venture investment in Puerto Rico with Liberty Global plc."); *see also id.* at Ex. 214, at 2 ("Mr. Cohen also reminded the Board that Mr. Zinterhofer's firm, Searchlight Capital, has a joint venture investment in Puerto Rico with Liberty Global [redacted] . . . .").

Liberty Global,[220] and a 2009 transaction selling Unitymedia to Liberty Global.[221] The Plaintiffs have also identified other early-stage transaction discussions that would have connected Zinterhofer and Malone-or-Maffei-affiliated entities, though none of these came to fruition.[222]

Similarly, Zinterhofer has engaged in at least one transaction with Malone-related affiliates *after* the Acquisitions. Most notably, Searchlight sold a portfolio company to Ocelot Partners, a special purpose acquisition company in which Malone and Maffei had invested, in March 2018.[223] These instances are supportive of the Plaintiffs' identified pattern of transactions or potential transactions involving Zinterhofer and Malone-affiliated entities.

The Plaintiffs also point to the fact that Rutledge replaced Zinterhofer as Chairman as evidence that Newhouse—who requested Rutledge be installed as Chairman—perceived Zinterhofer as too close to Liberty Broadband and/or Malone. Newhouse's advisors, UBS Securities LLC ("UBS"), represented through their

---

[220] *See* Loughman Decl., Ex. 59, at 18:13–19:16.

[221] *See id.* at Ex. 59, at 19:17–21:1. Zinterhofer was also on the board of Unitymedia from 2005 to 2010 (i.e., at the time of the Unitymedia-Liberty Global transaction). *See id.* at Ex. 59, at 19:17–21:1.

[222] *See id.* at Ex. 59, at 21:2–22:10; *see also* Cook Decl., Ex. 290 (audio file of Aryeh Bourkoff of LionTree leaving a voicemail wherein Zinterhofer suggested Searchlight could provide capital to Maffei if certain transactions were undertaken), *id.* at Ex. 291 (audio file of Bourkoff leaving a voicemail wherein Maffei might have been interested in buying a stake in a different company for which Zinterhofer was a director); *see also* AB 78.

[223] *See* AB 79. The Plaintiffs also point me to the fact that Zinterhofer became a director for General Communications, Inc. ("GCI") in 2014, but GCI was not acquired by a Liberty company until 2017. *See id.*

30(b)(6) witness that UBS had "raised red flags to our client about [Zinterhofer's] outside business interests with Liberty."[224] The 30(b)(6) witness specified that "there were outside business interests . . . in combination with the fact that [Zinterhofer] was unknown, that he was of a private equity background and that there was someone else [Rutledge] that the [Newhouse] family trusted and we thought would make a better chairman" contributed to Newhouse's decision to make a push for Rutledge as Chairman.[225] UBS also stated that Newhouse never "made a determination on whether they were comfortable with Mr. Zinterhofer's independence because there were other considerations that caused us to conclude that we would push for Tom Rutledge as Chairman."[226]

---

[224] *See* Loughman Decl., Ex. 104, at 80:1–80:19.
[225] *See id.* at Ex. 104, at 65:7–12.
[226] *See id.* at Ex. 104, at 76:13–19. The UBS deposition also included a lengthy discussion of whether certain talking points, prepared by UBS for Newhouse in the context of their preferred Chairman, demonstrated "an actual concern or a made-up concern to be used as a negotiating position" about Zinterhofer's independence. *Id.* at Ex. 104, at 80:1–6; *see also* Cook Decl., Ex. 146 ("The message would be that, given [Zinterhofer's] other investments alongside Liberty Global in Puerto Rico and perceived closeness to Malone's Liberty and Liberty Global assets, we struggle to see how he is Independent in his Chairman role. We wanted them to be aware of this very real concern . . . ."); *id.* at Ex. 147 (similar email from UBS to Newhouse). UBS's 30(b)(6) witness testified that "[Zinterhofer's independence] was not a fake concern because we obviously raised red flags to [Newhouse] about [Zinterhofer's] outside business interests with Liberty. So it was not a fake concern nor was it the concern that is expressed as a negotiating point in our talking points . . . . [I]t was somewhere in between." *See* Loughman Decl., Ex. 104, at 80:13–19. This answer, while hedging spectacularly, also follows a protracted questioning session by the Plaintiffs' counsel on the question of Zinterhofer's independence in the eyes of UBS and/or Newhouse. *Id.* at Ex. 104, at 49:18–82:12. I take this testimony into consideration in conducting my holistic analysis, but it is not a dispositive fact.

Miron, the CEO of Newhouse, also sat for a deposition.[227] Miron was asked whether Advance/Newhouse had concerns about Zinterhofer's independence.[228] Miron responded that "[W]e did not have a concern with—you know, with [Zinterhofer's] independence . . . I assume you're talking about the chairman role . . . . [F]or Advance[/Newhouse] . . . Tom [Rutledge] was a big part of this transaction."[229] Miron went on to clarify that "I didn't have concerns about—about [Zinterhofer's] independence . . . . [I]t was more about having confidence in Tom [Rutledge]."[230] The Plaintiffs suggest that this answer was borne of "politeness" or possibly Miron's having been coached.[231]

Further, when Maffei disagreed with the structure of the Original Bright House Transaction, Zinterhofer behaved in a manner that the Plaintiffs characterized as a "deferential, controlled mind-set sort of response,"[232] because Zinterhofer responded to Maffei that he would "make [it] very clear" that Maffei and Liberty Broadband were not on board with the term sheet and Board presentation circulated.[233]

---

[227] *See id.* at Ex. 38.
[228] *Id.* at Ex. 38, at 102:6–7.
[229] *Id.* at Ex. 38, at 102:11–104:4.
[230] *See id.* at Ex. 38, at 102:11–104:4. Supporting this statement were Miron's comments about having "known Tom [Rutledge] for—as I was telling you, for almost 30 years now and he is a superb—he's a superb operator and executive," and the fact that Advance/Newhouse "wanted Tom [Rutledge] to sign on for . . . another five-year term [as CEO]." *See id.* at Ex. 38, at 102:11–104:4.
[231] AB 81.
[232] *See* Oral Arg. at 125:9–19.
[233] *See* Cook Decl., Ex. 155.

Of final note, I recognize that Zinterhofer was not recused from discussing the potential Liberty Media financing via the 2013 Resolutions,[234] and that Zinterhofer instead was part of the working group identified in the 2013 Resolutions that was directed to consider and negotiate any such transaction.[235]

I take all of these concerns into account in assessing Zinterhofer's independence. To my mind, the allegations against Zinterhofer crystallize largely into three categories: first, concerns about his connections with Malone-affiliated entities; second, concerns that Newhouse, UBS, or Newhouse *and* UBS legitimately believed Zinterhofer might not have been independent at the time of the Acquisitions; and third, facts regarding Zinterhofer's responses to disagreement from Liberty Broadband Board designees regarding the at-issue transactions.

The first concern, per Plaintiffs, is in line with relevant caselaw supporting a finding of lack of independence. I turn first to *Sandys v. Pincus*, a case from our Supreme Court discussing directors with entangled investments.[236] In *Sandys*, the Court assessed whether two directors of company Zynga were independent of directors Pincus and Hoffman in the context of demand futility.[237] The Zynga directors in question served also as partners of firm Kleiner Perkins Caufield &

---

[234] *See id.* at Ex. 99, at Ex. A.
[235] *See, e.g.*, Loughman Decl., Ex. 30.
[236] 152 A.3d 124 (Del. 2016).
[237] *Id.* at 131.

Byers ("Kleiner Perkins"), which held 9.2% of Zynga's equity; Kleiner Perkins had also invested in a company that Pincus's wife co-founded.[238] Further, Kleiner Perkins and director Hoffman both had investments in yet another separate company, Shopkick, Inc.[239] Hoffman and another Kleiner Perkins director sat on the Shopkick board of directors.[240] Additionally, certain Zynga directors had suggested that the directors at issue were not independent.[241] Finally, Zynga had determined that the directors in question were not independent directors under the NASDAQ Listing Rules.[242]

After outlining these facts, the Delaware Supreme Court considered the criteria applicable to independence determinations under the NASDAQ Listing Rules, noting that the NASDAQ Listing Rules require "a fundamental determination that a board must make to classify a director as independent, a determination that is also relevant under our law."[243] The Court appeared to credit highly the company's own determination that the directors at issue were not independent under the NASDAQ Listing Rules, describing that criteria as having "important relevance" to

---

[238] *Id.*
[239] *Id.*
[240] *Id.*
[241] *Id.*
[242] *Id.*
[243] *Id.* at 132–33.

whether the directors were independent under Delaware law.[244] The Court then

discussed

> the reality . . . that firms like Kleiner Perkins compete with others to finance talented entrepreneurs . . . and networks arise of repeat players who cut each other into beneficial roles in various situations . . . . [P]recisely because of the importance of a mutually beneficial ongoing business relationship, it is reasonable to expect that sort of relationship might have a material effect on the parties' ability to act adversely toward each other. Causing a lawsuit to be brought against another person is no small matter, and is the sort of thing that might plausibly endanger a relationship.[245]

Ultimately, in conjunction with Zynga's determination that the two directors were

not independent under NASDAQ Listing Rules, the fact that other directors

considered the two in question less than independent, and the directors' entangled

business relationships, the Delaware Supreme Court found the subject directors to

lack independence for purposes of demand futility.[246]

There are distinguishing differences between *Sandys* and the facts before me.

First, I note, the decision was in the context of independence in light of a litigation

demand; as noted above, this is an easier bar for a plaintiff to clear than with the

issue before me. Next, missing here is any determination by the Company that the

challenged directors were not independent under the NASDAQ Listing Rules. That

---

[244] *Id.* at 133.
[245] *Id.* at 134.
[246] *See id.*

determination, in combination with the existing business relationships in *Sandys*, led to a finding of a lack of independence. By contrast, in evaluating Zinterhofer, there are no direct allegations that other directors considered him less than independent. The closest match is either (1) the allegation that Newhouse or Newhouse's advisors might have considered Zinterhofer less than independent, or (2) the fact that Charter had named Zinterhofer's Searchlight connection as a possible conflict of interest in various sets of meeting minutes.[247] The *Sandys* Court decision does not, to my mind, compel a finding of lack of independence on the part of Zinterhofer.

The other salient caselaw the Plaintiffs urge me to consider is *In re Dell Technologies*.[248] The Plaintiffs cite *Dell* for the proposition that a director can have a "compromising relationship" with a "close advisor or other associate" of *a controller* and therefore lack independence.[249] As noted previously, the law of the case is that Malone and/or Liberty Broadband are not controllers of Charter.[250] The Plaintiffs would amend the *Dell* language to refer to an associate of a "conflicted fiduciary."[251] Their theory here is that Zinterhofer is so close to Mike Fries, Liberty Global's CEO, that their relationship rises to the level of a "compromising"

---

[247] *See supra* notes 219 & 224–31 and accompanying text.
[248] *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *37 (Del. Ch. June 11, 2020).
[249] *Id.*
[250] *See generally Sciabacucchi I*, 2017 WL 2352152, at *20.
[251] *See* AB 80. I note that it is not entirely clear to me that this suggested change, from controller to conflicted fiduciary, is a fair or equivalent one, as it appears to be an expansion of *Dell.*

relationship with a "close advisor or other associate" of Malone.[252] As evidence, they point to the June 2015 Article, which included numerous quotes by Mike Fries expressing his fondness toward Zinterhofer and to the effect that Liberty Global would be willing to work with Searchlight (and therefore Zinterhofer) again in the future.[253]

I do not read the June 2015 Article as emblematic of the same type of "compromising relationship" shown in *Dell.* First, in *Dell*, the challenged director had a "thirty-year friendship and business association" with the close advisor in question, who described himself as the controller's "brother from another mother" and was one of the controller's "closest friends."[254] The ties between the challenged director and the close advisor were ample, including working on acquisitions together, co-founding a blank check company together, and service on various boards at each other's behests.[255]

Here, the alleged ties pointed to are quotes in an article and the potential for future deals together, all of which stem from Fries, rather than from Zinterhofer. This does not, to my mind, rise to the level of a compromising relationship as in *Dell.* While *Dell* does not expressly undertake this analysis, in my understanding, I

---

[252] *Dell*, 2020 WL 3096748, at *37.
[253] *See supra* notes 211–12 and accompanying text.
[254] *Dell*, 2020 WL 3096748, at *37.
[255] *See id.*

would need to find that Zinterhofer is not independent of Fries before I could apply *Dell* to extend Zinterhofer's lack of independence also to Malone.  I would likely also need to find that the ties between Fries and Malone were sufficiently close such that this extension was appropriate.  *Dell* is but a weak reed to support Plaintiffs' independence analysis here.

Finally, I note that *Dell* was a pleading-stage case.  While the linkage between a challenged director, a close advisor, and a controller could certainly be reasonably conceivable upon a motion to dismiss, summary judgment requires more than mere speculation.[256]  Thus, even if *Dell* could be extended in this manner (which I neither find nor foreclose), the evidence aggregated in this particular case is insufficient to allow me to do so.

In sum, the facts asserted regarding Zinterhofer and Searchlight's relationships with Liberty entities are attenuated, but are sufficient to give me pause, particularly where the Plaintiffs enjoy the benefit of the remaining inferences.  The Plaintiffs have not aggregated facts suggesting that Malone *actually employed* significant influence over Zinterhofer via Liberty Global, via Searchlight, despite the fact that Malone testified to having soft control over Liberty Global.[257]  Instead, the Plaintiffs ask me to find, as I did at the motion to dismiss stage, that Zinterhofer

---

[256] *See In re Barker Tr. Agreement*, 2007 WL 1800645, at *11 n.63 (Del. Ch. June 13, 2007) ("On a motion for summary judgment, though, mere speculation is no substitute for factual evidence.").
[257] AB 75 n.386.

54

was cognizant of the "possibility of endangering the Liberty Global/Searchlight joint ventures,"[258] and that this possibility was sufficient to render his judgment with respect to the Acquisitions sterilized or to cause him to be beholden to Malone. Essentially, the Plaintiffs are resting on the inference that the joint venture was sufficiently material to Zinterhofer—despite the fact that the relationship between Zinterhofer and Malone was attenuated by at least two degrees (Searchlight and Liberty Global)—that it sterilized his ability to make business decisions separate from Malone.

The facts regarding Newhouse and UBS's consideration of Zinterhofer's independence are weakly additive. At most, they show third parties' points of view on the matter of Zinterhofer's independence (and it is not clear to me that these points of view are undisputed). In my interpretation, these documents and testimony serve more as a support to the main point of the Plaintiffs' arguments: that Zinterhofer was so ensnared in the network of repeat players in the cable industry that he was beholden to Malone or had had his discretion sterilized by Malone's influence.

The third category of facts shown, discussing Zinterhofer's actual reaction in response to Maffei seeking to use his influence to reshape the Newhouse deal, is also, at best, mildly probative here. Simply because Zinterhofer indicated he would "make [it] very clear" that Maffei and Malone did not agree with the Bright House

---

[258] *Sciabacucchi II*, 2018 WL 3599997, at *14.

deal's structure does not demonstrate that his discretion had been sterilized.[259] At the same time, the statement does not support a finding of independence.

The case with respect to Zinterhofer's independence is a close one, and I am cognizant that I found him conflicted for purposes of demand futility (and Rule 12(b)(6)) in the earlier stages of this action,[260] though that does not compel an identical conclusion at this later stage, particularly as the context of voting on a transaction differs from that of demand futility. As this Memorandum Opinion has noted above, the independence analysis in the voting context is less demanding than the independence analysis in the demand futility context: "Denying a fellow director the ability to proceed on a matter important to him may not be easy, but it must . . . be less difficult than finding that there is reason to believe that the fellow director has committed serious wrongdoing and that a derivative suit should proceed against him."[261]

Altogether, I find that none of the facts compiled against Zinterhofer is sufficient to impugn his independence *standing alone*, but when taken as a whole— as is required at the summary judgment stage—the cumulative evidence is sufficient

---

[259] *See* Cook Decl., Ex. 155.
[260] *Sciabaccuchi II*, 2018 WL 3599997, at *13–16. .
[261] *In re Oracle Corp.*, 824 A.2d at 940; *see also Marchand*, 212 A.3d at 819 ("[T]he decision whether to sue someone is materially different and more important than the decision whether to part company with that person on a vote about corporate governance, and our law's precedent recognizes that the nature of the decision at issue must be considered in determining whether a director is independent.").

for me to draw the inference that Zinterhofer lacked independence. The facts could, I note, also support the opposite inference. Even taken cumulatively, many of the facts related above are tangential or relatively insubstantial, such that if the inferences were instead drawn in favor of the Director Defendants, I might find Zinterhofer to be independent.

But weighing inferences is not my task at summary judgment. Our case law instructs that the non-moving party, here the Plaintiffs, receives the benefit of inferences. As such, even upon a detailed review of the facts, I must credit the inference that Zinterhofer may have lacked independence for purposes of voting upon the Acquisitions.

I next address the facts collected with respect to Huseby.

### b. Huseby

Huseby was a Liberty Broadband designee director at the time of the vote upon the Acquisitions. I did not address the question of his independence in *Sciabacucchi II* in assessing demand futility.

Zinterhofer and Jacobson testified in depositions that they considered the Liberty Broadband designee directors, including Huseby, *conflicted* with respect to Liberty Broadband, though Zinterhofer did mention that Huseby in particular was not a Liberty employee and therefore the question of his independence from Liberty

Broadband was, to his mind, a separate inquiry.[262] Additionally, Huseby was identified in the 2013 Resolutions as "recuse[d] . . . for all purposes in connection with" any equity transaction with Liberty Broadband.[263]

Huseby described himself in at least one email as an "L" director—presumably "L" for "Liberty."[264] The Plaintiffs herald this self-description as a suggestion that Huseby did not *act* independently.[265] Similarly, the Plaintiffs point out that Liberty Media's general counsel, Rich Baer[266] (prior to the Liberty Broadband spinoff) may have attempted to negotiate Huseby's indemnification agreement with Charter.[267]

Huseby also participated in at least one email exchange with other Liberty Broadband designees, which the Plaintiffs point out did not include other Charter directors. The exhibit in question begins with Maffei providing Rutledge,

---

[262] Loughman Decl., Ex. 59, at 95:6–14 (Zinterhofer); *id.* at Ex. 93, at 120:6–21:10 (Jacobson). Jacobson made a similar point in his deposition, clarifying the distinction between being *conflicted as to matters involving Liberty Broadband*, and being *independent. Id.* at Ex. 93, at 120:24–121:10.

[263] Cook Decl., at Ex. 99, at Ex. A.

[264] *Id.* at Ex. 234 ("Fyi- I stayed on the call til L directors dropped off. For your record.").

[265] *See* AB 68. I note that the minutes of Charter Board meetings also refer to the four Liberty Broadband designees as "Liberty directors." *See, e.g.*, Cook Decl., Ex. 214, at 4 (including a heading titled "Discussion and Vote of Liberty Directors"); *id.* at Ex. 235, at 3 ("At approximately 11:27a.m. [sic], the Liberty directors and LionTree left the meeting."); *id.* at Ex. 256, at 2 ("At approximately 8:45 a.m., the Liberty directors and LionTree left the meeting."); *id.* at Ex. 264, at 3 ("At approximately 5:35 p.m., the Liberty directors and LionTree left the meeting.").

[266] *See* AB 68 (identifying Baer).

[267] *See* Cook Decl., Ex. 87. In the Plaintiffs' view, this is presumably evidence that Liberty Broadband had some level of control over Huseby. I note that the email does not conclusively demonstrate whether any negotiation actually occurred. *See id.*

Zinterhofer via carbon copy, and Christopher Winfrey (Charter's CFO) with a letter from a TWC shareholder, noting "We should definitely consider."[268] Maffei then forwarded the email to Malone, Huseby and Nair—the other Liberty Broadband designees—separately with the message "fyi[.]" Winfrey replied to the original chain in detail the next day, which Maffei again forwarded to Huseby and Nair.[269] Separately, Huseby responded to Maffei only (without copying Malone or Nair) with his substantive thoughts, noting he would be "interested in Tom's [Rutledge's] reaction/ response."[270] Maffei responded to Huseby to suggest that Huseby and Rutledge discuss.[271] I do note that all of these emails occurred in August 2015,[272] and that the Acquisitions were announced in *May* 2015,[273] so these emails post-date the applicable voting period. Despite that timing, Huseby's interactions with the Liberty Broadband designees after the vote still may have some bearing on his independence, considered holistically.

The main thrust of the Plaintiffs' Huseby-specific contentions is associated with his career in the cable and media industry. The Plaintiffs trace Huseby's professional career, which has previously overlapped with Malone's orbit.[274] For

---

[268] *Id.* at Ex. 285.
[269] *Id.* at Ex. 286.
[270] *Id.* at Ex. 287.
[271] *Id.* at Ex. 287.
[272] *See id.* at Exs. 285, 286, 287.
[273] *See* AB 54.
[274] *See id.* at 69–71.

example, Huseby worked for AT&T Broadband in an officer position at the same time Malone was on its Board.[275] Huseby was the CFO at Cablevision at the same time Malone was on *that* Board—though Huseby qualified in his deposition that this time period was about "two or three months" and that they only attended one board of directors meeting in common.[276]

Most significantly, according to the Plaintiffs, Huseby became CFO of Barnes & Noble in 2012 after Maffei, who was a Liberty Media designee on the Barnes & Noble board of directors, referred him as a candidate for the position.[277] Shortly after, in 2014, Huseby became the CEO of Barnes & Noble, with the support of both Maffei and another Liberty Media designee seated on the Barnes & Noble board of directors at the time.[278] The Plaintiffs also point out that Liberty Media, the former parent of Liberty Broadband, owned a 17% stake in Barnes & Noble at the time of Huseby's hiring in 2012.[279]

Based on these prior positions, the Plaintiffs ask me to find that Huseby was part of a "network of repeat players" in the industry, and that the various brushes he had had with Malone and Maffei prior to the relevant period created a "sense of 'owingness' to the Liberty family and Maffei, in particular, for past benefits

---

[275] Loughman Decl., Ex. 95, at 64:12–16.
[276] *Id.* at Ex. 95, at 19:7–21:23.
[277] *Id.* at Ex. 95, at 45:5–11 (identifying that Liberty Media's CEO, then Maffei, had a seat on the Barnes & Noble board of directors); 48:2–19.
[278] *Id.* at Ex. 95, at 71:3–7; 75:18–76:25.
[279] *See id.* at Ex. 95, at 76:15–25.

60

conferred."[280]  Related in vintage are the less-than-persuasive facts that Huseby and Maffei were members of the same country club as of 2015, and have golfed together on at least two occasions.[281]  Huseby did qualify in his deposition that the country club at issue is located in Denver, Colorado, and that he has not lived in Denver since 2004.[282]

Each of these facts is presented to support a finding that Huseby and Maffei (or Huseby and Malone) had a relationship significant enough to displace Huseby's independence.  One exemplar case helpful in considering Huseby's independence  is *Marchand v. Barnhill*, a Delaware Supreme Court case from 2019.[283]  In *Marchand*, the challenged director was found to lack independence on strength of an inference that the director's "successful career as a businessperson was in large measure *due to* the opportunities and mentoring given to him" by various members of the Kruse family.[284]  The analysis covers a number of positions the director held with the family's company, including senior executive positions such as CFO, an appointment to the board of directors, and donations by the family which ultimately led to the director's having a university building named after him.[285]

---

[280] AB 69–70 (cleaned up).

[281] *Id.* at 70; *see also* Loughman Decl., Ex. 95, at 29:9–19.

[282] Loughman Decl., Ex. 95, at 28:23–30:9.

[283] 212 A.3d at 819–20.  *Marchand* was a pleadings-stage case as compared to the instant case on summary judgment.

[284] *Id.* (emphasis added).

[285] *Id.*

The facts regarding Huseby, by contrast, are not so compelling. Admittedly, Huseby's seat on the Charter Board stems from his status as a Liberty Broadband designee. But the other, more personal facts found in *Marchand* are not replicated in the instant case. The facts seeking to establish a personal relationship between Huseby and Maffei are thin, hinging largely on two rounds of golf and membership at the same club. The facts indicating professional ties are sturdier. But the Plaintiffs have not argued that Huseby's success as a businessperson is due solely or even significantly to his personal relationships with Malone, Maffei, or Liberty Broadband. The Plaintiffs focus on Huseby's relationship with Maffei in particular, but the fact that Maffei identified Huseby to the board of directors of Barnes & Noble as a potential CFO is not itself indicative of a deep and historical relationship. If Huseby had—similar to the director in *Marchand*—obtained his success via work at Liberty companies, the allegations would be more compelling. I can, of course, infer that Huseby was likely *grateful* to Maffei for the Barnes & Noble reference in 2012, but to my mind that is insufficient on its own to imply that Huseby was beholden to or had had his discretion sterilized by Maffei.

Again, I must consider the facts asserted against Huseby in their totality, rather than addressing each item-by-item. This holistic review produces the same result that befell Zinterhofer, above. The facts gathered in support of a lack of independence are not compelling individually, but in their totality, could give rise to

62

an inference in favor of the Plaintiffs that Huseby lacked independence in voting upon the Acquisitions. This inference, I note, is not strong, and as with Zinterhofer, I caution the parties that the facts could also support an opposing inference. Again, my task at summary judgment is not to weigh competing inferences, and the Plaintiffs are entitled to the benefit of the inferences. On balance, I may infer that Huseby lacked independence, at this summary judgment stage.[286]

I consider Nair's independence next.

### c. Nair

I considered Nair conflicted at the pleading stage in *Sciabacucchi II*.[287] He, like Huseby, holds a seat on the Charter Board as one of Liberty Broadband's four designees,[288] and is further tied to the Liberty conglomerate in that he is the Executive Vice President and CTO of Liberty Global.[289] As mentioned above, Malone holds a 25% voting stake in Liberty Global, making Malone the largest stockholder of the company; he is also the Chairman.[290]

To demonstrate Malone and Maffei's influence over Nair, the Plaintiffs mainly rely on facts about his employment at Liberty Global, including: that Malone

---

[286] The Plaintiffs also argue that Huseby and Nair were, regardless of their independence, uninformed when they voted for the Acquisitions. I need not reach this question at this stage.
[287] *See Sciabacucchi II*, 2018 WL 3599997, at *12.
[288] Loughman Decl., Ex. 112, at 90:3–6.
[289] Cook Decl., Ex. 19, at 7.
[290] *Id.* at Ex. 23, at 8, 11; *Sciabacucchi II*, 2018 WL 3599997, at *12.

testified he had soft control over Liberty Global;[291] that Nair interviewed for the role of CTO with Malone and two others;[292] that Nair worked in the same building as Malone and Maffei from 2007 to 2016;[293] that Nair (along with others) traveled to Malone's properties for Liberty Global business meetings;[294] and that Nair financially supported himself using primarily income from his role as CTO.[295] The Plaintiffs also highlight that Rich Baer, Liberty Media's general counsel, may have attempted to negotiate Nair's indemnification agreement with Charter, as well.[296]

Nair has also made a few statements regarding Malone that could suggest a lack of independence. These include Nair being quoted in various interviews. One such quote reads as follows: "As Mike [Fries] reminds me, we stand on the shoulders of giants, and amazing entrepreneurs. The pioneers of this industry."[297] At his deposition, Nair indicated that he would consider Malone one of many such giants, pioneers, and amazing entrepreneurs.[298] This fact is of little suasion to me.

---

[291] Loughman Decl., Ex. 98, at 46:23–47:3.
[292] *Id.* at Ex. 112, at 65:22–67:12.
[293] *Id.* at Ex. 112, at 72:10–74:4. I do note that Nair indicated he traveled often for his job, so he was not often in the office in question. *See id.* at Ex. 112, at 72:10–74:4.
[294] *Id.* at Ex. 112, at 56:8–57:3 (identifying the meetings in question as yearly); *id.* at Ex. 112, at 30:15–36:23 (identifying the meetings in question as taking place at various properties owned by Malone).
[295] *Id.* at Ex. 112, at 81:3–14.
[296] Cook Decl., Ex. 87. Again, I note that the email does not conclusively demonstrate whether any negotiation actually occurred. *See id.* at Ex. 87.
[297] Loughman Decl., Ex. 114.
[298] *Id.* at Ex. 112, at 47:25–48:8.

64

Nair also mentioned in a separate interview that the Liberty LatAm board of directors consisted of, in 2018, Malone, Zinterhofer, Mike Fries, and Paul Gould.[299] He described the four directors as "the smartest people on Wall Street," and went on to briefly describe each of them in addition to certain operators.[300] Nair's description of Malone was "he [is] wise in so many ways."[301]

I note that these interviews took place in 2018 and 2019, so they post-date the relevant period by at least three years.[302] Since that time, Nair has become the CEO of Liberty LatAm, as well.[303] This timing, perhaps, is not dispositive, but weakens the inferential value that might otherwise stem from these statements.

More concerning to me is a communication from Nair to Maffei when the Charter Board was seeking final approval of the Original Bright House Transaction: "Greg: Have they cleared everything in here with you? Anything that you/John would disagree with?"[304] Maffei wrote back: "Plenty, but we will probably get there. Thanks for asking[.]"[305]

Finally, Nair was one of the directors identified in the 2013 Resolutions as "recuse[d] . . . for all purposes in connection with" any equity transaction with

---

[299] *Id.* at Ex. 115.
[300] *Id.* at Ex. 115.
[301] *Id.* at Ex. 115.
[302] *See id.* at Exs. 114, 115.
[303] *Compare id.* at Ex. 115, at 2, *with* Cook Decl., Ex. 19, at 7; *see also* Loughman Decl., Ex. 113.
[304] Cook Decl., Ex. 212.
[305] *Id.* at Ex. 212.

Liberty Media,[306] and two directors, Zinterhofer and Jacobson, have testified at least generally that they considered the Liberty Broadband designee directors, including Nair, conflicted with respect to Liberty Broadband.[307]

Considering, as I must, these facts as a whole,[308] and particularly the latter facts above, I may infer at this more demanding procedural stage that Nair lacked independence. The facts regarding Nair's employment as CTO of Liberty Global are suggestive that Malone or Maffei could exert influence over him such that he might be beholden to their wishes, particularly because Nair testified that his primary source of income stemmed from Liberty Global, where, again, Malone maintained "soft" control.[309] The facts cited are detailed with respect to the length, nature, and extent of Nair's professional relationships with Malone and Maffei and suggestive of an inability to objectively consider the Acquisitions.

Nair's commentary about Malone in various interviews is also slightly supportive of a finding of a lack of independence.[310] *In re BGC Partners* advises

---

[306] *See* Loughman Decl., at Ex. 99, at Ex. A.
[307] *Id.* at Ex. 59, 95:6–14 (Zinterhofer); *id.* at Ex. 93, 120:6–121:10 (Jacobson). Zinterhofer, in his deposition, specified shortly thereafter that "whether [the Liberty Broadband designees were] independent or not is . . . a different point. Some of these—like Mike Huseby wasn't necessarily, you know, working at Liberty . . . ." *Id.* at Ex. 59, 96:5–10. Zinterhofer did not make such a qualifying statement about Nair (who was, of course, working at a Liberty company).
[308] *See Voigt*, 2020 WL 614999, at *13 ("Sources of influence and authority must be evaluated holistically, because they can be additive. Different sources of influence that would not support an inference of control if held in isolation may, in the aggregate, support an inference of control.").
[309] *See supra* note 291 and accompanying text.
[310] *See, e.g.*, *In re BGC Partners*, 2021 WL 4271788, at *9.

66

that a director's "'exceptionally glowing' admiration for a controller combined with a lengthy relationship can cast 'substantial doubt' on her ability to impartially consider a litigation demand against the controller."[311]  Nair's descriptions of Malone could be considered "glowing," and his relationship with Liberty companies and Malone is certainly lengthy.[312]

Most importantly, Nair's *own communications* are reflective of a controlled mindset. Before casting his own vote in favor of the Original Bright House Transaction, Nair inquired with Maffei as to whether Maffei and/or Malone found the transaction acceptable.  The implication of this message is that Nair cared, in the context of casting his vote, whether Maffei or Malone had any concerns with respect to the Original Bright House Transaction, and that he would act according to their answer.  I note that this email did not pertain to the *Acquisitions*, but to the Original Bright House Transaction.  Nevertheless, the attitude reflected in this email, even if not contemporaneous with the challenged transactions, can readily give rise to an inference that Nair voted in the context of a controlled mindset.  Taking this email in conjunction with Nair's employment at a Liberty entity and his commentary about Malone, and attributing the benefit of reasonable inferences in favor of the Plaintiffs,

---

[311] *Id.*

[312] Though I note that I found in *Sciabacucchi I* that Malone and/or Broadband were not controllers of Charter.  *See Sciabacucchi I*, 2017 WL 2352152, at *20.  Additionally, the procedural context does differ from *In re BGC Partners*, in that the pertinent question here is whether Nair was independent in voting for the Acquisitions.  Nonetheless, Nair's comments  are at least mildly suggestive that he lacked independence under *In re BGC Partners*.

I may infer even at this more advanced procedural stage that Nair was beholden to Malone. The evidence supports an inference that Nair was not independent of Malone, and he therefore cannot count toward the total of independent Charter directors voting for the Acquisitions.

Finally, I turn to Rutledge.

### d. Rutledge

Rutledge was, at the pertinent time, the CEO and a director of Charter.[313] In *Sciabacucchi II*, I considered Rutledge to be conflicted at the pleading stage, and made the comparative note that I perceived the allegations against Rutledge's independence as weightier than those leveled against Nair.[314]

Most of the allegations against Rutledge stem from his employment with Charter. The Plaintiffs point to his status as a senior executive officer of a company over which Malone could exert "substantial influence" via Liberty Broadband,[315] which was a 26% stockholder of Charter and had the right to appoint four of the ten

---

[313] *See, e.g.*, Cook Decl., Ex. 6, at 4 (Charter press release including letter signed by Thomas Rutledge as President and CEO).
[314] *Sciabacucchi II*, 2018 WL 3599997, at *13.
[315] *Id.* Malone "owns 47%" of Liberty Broadband. *Id.* Liberty Broadband *was* constrained, though, from acquiring over 39.99% of Charter's voting power. *See* Loughman Decl., Ex. 17, at Ex. 1.1, at § 3.1; *see also Sciabacucchi II*, 2018 WL 3599997, at *2.

68

directors.[316] I have previously found in this case that Liberty Broadband was not a controller of Charter, so this does not end the analysis.[317]

Following the Acquisitions, Rutledge was promoted to Chairman of Charter's Board,[318] in no small part thanks to Miron of Newhouse,[319] who insisted that Rutledge be named Chairman of the combined company.[320] Per Malone in his deposition, "Tom [Rutledge] was pushing to be chairman."[321] Maffei commented similarly in his deposition: "I think [replacing Zinterhofer as Chairman] was encouraged by Tom [Rutledge]."[322]

Rutledge also received a new employment contract shortly after the Acquisitions were papered.[323] (His previous contract is championed by the Director Defendants as inoculating him from influence due to its $77 million severance package upon termination without cause.[324] But that employment contract was due to expire within a matter of months.[325]) That new employment contract provided

---

[316] Loughman Decl., Ex. 17, at Ex. 1.1, at § 2.1(b)(1) (conferring ability to appoint four directors); *id.* at Ex. 17, at Ex. 99.1 (identifying the dollar amount and percentage of the original Liberty Media investment).

[317] *See Sciabacucchi I*, 2017 WL 2352152, at *20.

[318] *See* Cook Decl., Ex. 214, at 2 ("[A]s part of the Proposed Acquisition, Mr. Rutledge received an offer for the combined position of CEO/Chairman post-closing . . . .")

[319] Newhouse was the owner of Bright House prior to the Acquisitions. AB 21.

[320] Loughman Decl., Ex. 38, at 103:11–104:4.

[321] *Id.* at Ex. 98, at 147:21–22.

[322] *Id.* at Ex. 20, at 134:4–12.

[323] *See, e.g.*, AB 73–74.

[324] OB 40.

[325] *See* Loughman Decl., Ex. 105, at § 2, Recitals.

Rutledge with an increase in compensation.[326]  Even prior to the new employment contract, employment with Charter provided Rutledge's "primary source" of gross annual income in 2014 and 2015.[327]

Beyond his employment with Charter, the Plaintiffs point to certain quotes attributable to Rutledge about Malone: that "when [Malone] talks, I listen.  And he is a significant talker."[328]  Rutledge also told Steve Miron, the CEO of Newhouse, that Malone "fills the room."[329]

Finally, Rutledge was one of the directors identified in the 2013 Resolutions as "recuse[d] . . . for all purposes in connection with" any equity transaction with Liberty Media.[330]  The Plaintiffs say that Rutledge was perceived as conflicted by "his fellow directors," pointing to director Conn's supporting deposition and the 2013 Resolutions.[331]  Conn stated in his deposition that in his understanding

---

[326] The extent to which Rutledge received a *meaningful* increase in compensation is disputed amongst the parties.  The Plaintiffs noted at oral argument that, even if you accepted the Director Defendants' math (which they clearly disputed), Rutledge still received a $4 million per year raise over five years.  Oral Arg. at 112:19–113:20.

[327] *See* Cook Decl., Ex. 66, at 32–33.  The Director Defendants raise the competing theory that, because Rutledge's compensation was paid in part through equity awards, Rutledge necessarily would have prioritized the value of his Charter shares, rather than feeling beholden to Malone, Maffei, or Liberty Broadband.  OB 41–42.  The Plaintiffs' counsel addressed this head-on at oral argument, identifying that Rutledge owned about 0.2% of Charter's total outstanding shares per its annual proxy.  Oral Arg. at 114:1–5.  Rutledge stood to receive $20 million over the new five-year employment contract.  *See id.* at 113:11–13.  Therefore, the Broadband Transactions would have had to cause over $10 billion in damages to Charter to outweigh the expected $20 million increase in compensation Rutledge was scheduled to receive over five years.  *Id.* at 114:6–11.

[328] Cook Decl., Ex. 54.

[329] *Id.* at Ex. 128, at UBS00029039.

[330] *See id.* at Ex. 99, at Ex. A.

[331] AB 72.

70

Rutledge was recused because "as an inside director, it's probably appropriate for him not to be involved in the discussions of a transaction that ultimately might affect him and management."[332]   Conversely, Conn was asked whether he had any understanding that Rutledge's recusal was "at all related to" Liberty Broadband's involvement, and he answered no.[333]

The reasons to doubt Rutledge's independence are persuasive viewed holistically, but the Director Defendants do raise certain points worthy of consideration.  The strongest evidence against Rutledge lies in his status as CEO and his receipt of a new employment contract and new title shortly following the Acquisitions.  The Director Defendants saliently argue, however, that the Chairman title was not awarded to Rutledge due to actions on Liberty Broadband's behalf (suggesting he was not influenced by Liberty Broadband); rather, *Newhouse* insisted that Rutledge be named Chairman.[334]  The Charter annual proxy for fiscal year 2017 also indicates that Rutledge's promotion to Chairman was made "largely in response to the Transactions"—and the annual proxy further defines "Transactions" as the acquisitions of TWC and Bright House, without mentioning the Liberty Broadband equity financings.[335]   Therefore, the Director Defendants argue, the Chairman

---

[332] Loughman Decl., Ex. 8, at 97:25–98:10.
[333] *Id.* at Ex. 8, at 98:23–99:2.
[334] RB 14.
[335] Cook Decl., Ex. 35, at 21–22.

promotion was not due to *the challenged transactions*, which are the Broadband Transactions *only*.[336] The promotion came about as a result of the acquisitions of TWC and Bright House.[337]

This argument loses its steam when the reader recalls that the Director Defendants are otherwise arguing the Broadband Transactions were a necessary component of the higher-level Acquisitions,[338] and that the stockholder vote, at least, conditioned those Acquisitions on approval of the Broadband Transactions.[339]

Beyond the Chairman role, Rutledge stood to receive a new employment contract as an indirect result of the Acquisitions, and would retain his title as CEO. His compensation increased following the Acquisitions. He spoke to news outlets and potential merger partners about Malone in positive terms, and quotes he provided in interviews are suggestive of Rutledge's perception of Malone's influence in the Board room. Finally, director Conn noted that Rutledge "probably" should not have been involved in any transactions that would have affected management.[340]

---

[336] RB 14–15.
[337] *Id.*
[338] *See, e.g., id.* at 45–46 ("Plaintiffs do not address, let alone contest, the evidence that TWC insisted that Broadband commit to invest in the merged company. . . . [P]laintiffs' theory that Charter could have alternatively financed the TWC acquisition is not supported by the record.").
[339] *See supra* note 124 and accompanying text.
[340] Loughman Decl., Ex. 8, at 97:25–98:10.

To my mind, the totality of the facts regarding Rutledge's promotion, increased compensation, reliance on said compensation as a source of primary income, and renewed employment contract are sufficient to find a lack of independence, bolstered by the quotes suggesting that Malone exercises influence at Charter as a "significant talker" to whom Rutledge "listen[s]."[341] *Voigt v. Metcalf*, a Court of Chancery case from 2020, is supportive of this conclusion, though it was a pleading-stage case.[342] There the Court found that "the prospect of serving as Chairman and CEO of the combined company induced [the defendant] to favor" the transaction at issue.[343] The instant facts go beyond those of *Voigt* in that Rutledge received not just the Chairman and CEO position, but that he also received increased compensation (though the exact amount of that increase remains in dispute).[344]

Upon review of the facts, and according the Plaintiffs the benefit of the necessary inferences, I may infer that Rutledge was not independent for purposes of voting on the Acquisitions.

\* \* \*

I have found above that the Director Defendants cannot establish at summary judgment that a majority of Charter's Board was independent at the time of voting

---

[341] Cook Decl., Ex. 54.
[342] *Voigt*, 2020 WL 614999, at \*16.
[343] *Id.* (citing *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at \*7 (Del. Ch. Sept. 28, 2015)).
[344] *See supra* notes 326–27 and accompanying text.

upon the Acquisitions. As such, business judgment review is unavailable to the Director Defendants at the summary judgment stage. I turn now, briefly, to the entire fairness arguments.

### B. The Entire Fairness Analysis

In the alternative, the Director Defendants have argued that even under the entire fairness standard, I should grant their motion for summary judgment, as the price and process associated with the Broadband Transactions were both entirely fair.[345]

As the Delaware Supreme Court teaches in *Weinberger*, fairness breaks down into the twin concepts of fair price and fair dealing (or process), but the analysis of the two is "not a bifurcated one."[346] Rather, like the independence test undertaken above, "[a]ll aspects of the issue must be examined as a whole," as the test is one of "*entire* fairness."[347] Facts relating to fair price might include economic and financial considerations associated with the transaction in question, such as assets, market value, earnings, future prospects, and other elements affecting the value of stock.[348] Facts probative of fair process are those relating to the timing and initiation of the transaction, its structure, the negotiation process, what directors were told about the

---

[345] *See* OB 44–63.
[346] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).
[347] *Id.* (emphasis added).
[348] *Id.*

transaction and when, and the approvals process for both the directors and stockholders.[349]

It is commonly stated in pleading-stage cases that the application of entire fairness standard of review will normally preclude dismissal of a complaint, due to the lack of an established record.[350] At summary judgment, where the motion is brought by the defendants, the defendant has had the opportunity to develop facts regarding the complained-of transaction, but the non-moving party still receives the benefit of all inferences in its favor.[351] As a result, unless the defendants can develop a theory of the case that is supported by undisputed material facts, *and* which is not defeated by plaintiff-friendly inferences, granting summary judgment on the question of entire fairness will likely still remain inappropriate. "Although not inevitable in every case, in those cases in which entire fairness is the initial standard, the *likely* end result is that a determination of that issue will require a full trial."[352]

---

[349] *Id.*

[350] *See, e.g.*, *Orman v. Cullman*, 794 A.2d 5, 21 n.36 (Del. Ch. 2002); *Berteau v. Glazek*, 2021 WL 2711678, at *15 (Del. Ch. June 30, 2021); *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779 (Del. Ch. Jan. 27, 2021); *Salladay v. Lev*, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020); *Klein v. H.I.G. Cap., L.L.C.*, 2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018) ("The possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6) unless the alleged controlling stockholder is able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it."); *Hamilton Partners L.P. v. Highland Cap. Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014); *Olenik v. Lodzinski*, 208 A.3d 704, 719 n.74 (Del. 2019); *Calma ex rel. Citrix Sys., Inc. v. Templeton,* 114 A.3d 563, 589 (Del. Ch. 2015).

[351] *See Encite LLC v. Soni*, 2011 WL 5920896, at *18 (Del. Ch. Nov. 28, 2011).

[352] *Orman*, 794 A.2d at 21 n.36.

There is at least one genuine issue of material fact disputed here: whether the Broadband Transactions were necessary to the greater Acquisitions.[353] To my read, this is a factual question likely affecting fair price. Supplemental to this point is an evident dispute over the amount of leverage TWC would tolerate in the combined company before it would accept a merger offer. For example, the Director Defendants' briefing states that the TWC CEO identified in 2013 "obstacles to a merger" including "the leverage of the combined company,"[354] at a time when Charter's debt-to-EBITDA leverage ratio was approximately 5.0x (higher than its peers at Comcast, TWC, and Cox Communications).[355] The Board appears to have targeted a 5.0x leverage ratio for the combined company following this conversation; both Plaintiff and Defendants are evidently agreed on this point.[356]

By contrast, the Plaintiffs' papers focus on leverage ratios that Goldman Sachs said it could finance, rather than the leverage ratios that TWC would accept in a merger partner.[357] The answering brief *does* quote an email from Charter CFO Winfrey noting that Charter had "to thread the needle of . . . [the proposed $100 in

---

[353] *See, e.g.*, AB 107–15 (arguing the Acquisitions did not require the Broadband Transactions in order to be accomplished); OB 55 ("[T]he challenged transactions were necessary to the acquisitions and thus . . . the acquisitions were properly conditioned on stockholder approval of the challenged transactions."). My above-the-line statement here should not be read as concluding that there is only *one* genuine issue of material fact disputed in the case, though I only identify one in this Memorandum Opinion.

[354] OB 8.

[355] *Id.* at 5–6.

[356] *Id.* at 9, 11; AB 37–38.

[357] *See, e.g.*, AB 17, 18, 111.

cash plus stock offer] against i) attractiveness of our bid relative to [a competing bidder]; ii) overall debt commitment size (and *downside leverage ratio*) in backstopping an equity commitment . . ."[358] Thus, the Plaintiffs seemingly acknowledge that the leverage ratio was a significant component in TWC's assessment of Charter's offers, but dispute the amount of leverage that TWC would find permissible. To the extent the amount of leverage acceptable evolved over the years in which Charter pursued an acquisition of TWC, a fuller record will be beneficial to addressing that question at trial.

Given that there is at least one genuine issue of material fact before me pertinent to the entire fairness analysis, I cannot enter the Director Defendants' Motion on this ground, either. Because both theories forwarded in the Director Defendants' Motion fail as a matter of law, the motion must be denied.

### C. Liberty Broadband's Motion

As noted above, the Liberty Broadband motion for summary judgment is largely derivative of the result obtained by the Director Defendants. Because I deny their motion here, and because testimony given at trial will likely be of probative value in assessing the cause of action against Liberty Broadband, I exercise my discretion to deny summary judgment and resolve this issue following trial.

---

[358] *Id.* at 40; Cook Decl., Ex. 229.

## III. CONCLUSION

The Director Defendants' Motion is DENIED.  Liberty Broadband's motion for summary judgment is DENIED.  An Order is attached.

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MATTHEW SCIABACUCCHI and
HIALEAH EMPLOYEES' RETIREMENT
SYSTEM,

          Plaintiffs,

          v.

LIBERTY BROADBAND
CORPORATION, JOHN MALONE,
GREGORY MAFFEI, MICHAEL
HUSEBY, BALAN NAIR, ERIC
ZINTERHOFER, CRAIG JACOBSON,
THOMAS RUTLEDGE, DAVID
MERRITT, LANCE CONN, and JOHN
MARKLEY,

          Defendants,
and

CHARTER COMMUNICATIONS, INC.,

          Nominal Defendant.

C.A. No. 11418-VCG

## ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

WHEREAS, on October 29, 2021, Defendant Liberty Broadband Corporation ("Defendant Liberty Broadband") and Defendants Lance Conn, Michael Huseby, Craig Jacobson, Gregory Maffei, John Malone, John Markley, David Merritt, Balan Nair, Thomas Rutledge, and Eric Zinterhofer (collectively, the "Director Defendants") filed separate Motions for Summary Judgment;

WHEREAS, on December 2, 2021, Plaintiffs Sciabacucchi and Hialeah Employees' Retirement System filed their Omnibus Answering Brief in Opposition to Defendants' Motions for Summary Judgment;

WHEREAS, on December 22, 2021, Defendant Liberty Broadband and the Director Defendants filed separate reply briefs in further support of their Motions for Summary Judgment;

WHEREAS, on January 19, 2022, the Court and the parties conducted oral argument on the Motions for Summary Judgment via Zoom;

IT IS HEREBY ORDERED in accordance with the Court's May 2, 2022 Memorandum Opinion:

1. Defendant Liberty Broadband's Motion for Summary Judgment is DENIED.

2. The Director Defendants' Motion for Summary Judgment is DENIED.

Dated: May 2, 2022

_____
Vice Chancellor Sam Glasscock III